**CITY OF KANSAS CITY, Missouri, Respondent,**

v.

**Jimmy JORDAN, Appellant.**

**No. WD 64388.**

Missouri Court of Appeals, Western District.

Oct. 25, 2005.

Carl W. Bussey, Kansas City, MO, for appellant.

Sarah Baxter, Kansas City, MO, for respondent.

Before RONALD R. HOLLIGER, P.J., ROBERT G. ULRICH and JOSEPH M. ELLIS, JJ.

ROBERT G. ULRICH, Judge.

Jimmy R. Jordan appeals the judgment against him and in favor of Kansas City in the sum of $19,772.50 as an in personam personal debt for demolition costs of Mr. Jordan's property, located at 2328 Elmwood. The judgment grants Kansas City a tax lien in the amount of the judgment on the property as a special assessment lien in rem for demolition costs. The judgment further found that the city of Kansas City had not wrongfully demolished Mr. Jordan's building and, thus, was not liable for damages for wrongful demolition. Mr. Jordan raises three points on appeal. He contends that the judgment should be reversed because: (1) the City failed to give him proper notice; (2) the Kansas City Ordinance section 56–540, which addresses emergency situations in violation of code provisions, fails to comply with the Revised Statutes of Missouri and is thus invalid; and (3) the City failed to follow statutory procedures and, thus, wrongfully demolished his building. The judgment of the circuit court is affirmed.

### Facts

David Miller is a construction code inspector for the City of Kansas City Dangerous Buildings. His duties as a dangerous building inspector include inspecting buildings to determine whether they are structurally sound, and if not structurally sound, whether repair of the building is economically feasible. If he determines that a building is dangerous or not economically feasible to repair, he initiates and advances the process, set forth in the

statutes and ordinances *infra*, of getting the building demolished.

On June 1, Mr. Miller completed an initial inspection of the two story brick commercial building with a one story wood addition on the north end located at 2328 Elmwood and belonging to Jimmy R. Jordan.[1] Mr. Miller observed that: the one story wood addition was in very poor shape; all of the sides were rotting and falling off the building; the back wall was collapsing outward; the chimney was falling; the brick building was in very bad shape; and the parapet[2] was falling apart, with the entire front of the building falling away from the building. The building was boarded up, but he could see inside the south window and it appeared that the roof and second floor had collapsed. He spoke with some children who were playing across the street, and they told him that the roof and second floor had collapsed. Mr. Miller called the Fire Department for a ladder truck to observe the top of the building better. He took pictures of the collapsed roof. His pictures show that the chimney was leaning backwards and off to the side; several of the wood boards were missing from the sides of the building; the wood was in poor condition; the door frame was rotted and falling; part of the second floor was collapsed; floor joists were broken and missing; and the ceiling had fallen. Mr. Miller determined that the building was unsound. He concluded that the building's integrity had been compromised as there were no floor joists or roof to hold the building together. After determining that the building was dangerous,

Mr. Miller posted dangerous building warnings on the front and back of the building. These warnings were "do not enter" warnings meant to keep the public out of the dangerous building. He then started the process for a priority demolition[3] case. He prepared an Order to Demolish and submitted it to Paul Benner, the head of the Dangerous Buildings Department. Mr. Benner is the one responsible for making the final determination that an Order to Demolish is warranted.

Once the case had been opened, Mr. Miller did a feasibility report. A feasibility report assesses the current condition of a building and approximates the cost of making the building useable again. This approximated cost is the amount of money needed to make the building merely useable; it does not approximate the cost of a perfect or new building. In the feasibility report, the value of the building once it is made useable is also approximated. Mr. Miller testified that he does not determine the dollar amounts; Mr. Benner does that utilizing computations used by general contractors. The dollar amounts are determined using the square footage needing repair. The feasibility report indicated that Mr. Jordan's building would be worth $10,000–15,000 once it was restored to a useable condition. The report also concluded that $120,600 was required to bring the building up to a useable condition.[4]

Mr. Miller initially inspected Mr. Jordan's building because of its location. The City had been actively pursuing potentially

---

1. This building will be referred to as Mr. Jordan's building throughout this opinion.

2. A parapet is a low wall around the edge of a roof or a terrace.

3. As will be explained, *infra*, City ordinances provide two types of demolition. Mr. Miller first started the process of demolishing this

building as a regular demolition; at this time, the building was not an emergency demolition situation.

4. At trial, Mr. Jordan questioned the methods used to calculate these numbers. He does not appeal the issue, however, and the numbers are accepted.

dangerous buildings that were located near schools, parks, playgrounds, or any other place that might attract children. The City was concerned that children might be playing in and around dangerous structures and might be harmed. A school,[5] playground, daycare, and park were all within the near vicinity of Mr. Jordan's building.

On June 9, 2000, Mr. Miller returned to Mr. Jordan's building at approximately 10:00 a.m. He had received a request for emergency response from the Fire Marshall. Upon arrival at Mr. Jordan's building, Mr. Miller found that the brick building's roof and the second floor had completely collapsed to the first floor. He further found that the east and north wall were in imminent danger of collapsing onto the public street and sidewalk. He documented his findings and took additional pictures. His pictures show that the entire roof had collapsed, as opposed to its condition on June 1 when just a portion had collapsed. He estimated that in the nine days between his visits, eighty percent more of the roof had collapsed and Mr. Miller characterized the building as "seriously worse" on June 9 compared to its June 1 condition. He also observed that the parapet, which overlooked a public sidewalk, was separating from the building and moving forward. He monitored the parapet and observed that it was gradually moving about every hour. His concern for the public was intensified because a large daycare for children and playground were located across the street from Mr. Jordan's building.

Mr. Miller determined that the building was a danger to the public and needed to be demolished pursuant to emergency demolition procedures; the Fire Marshall agreed. Mr. Miller called Mr. Benner and requested an Emergency Order to Demolish. Mr. Benner reviewed the information, which included the information he already had because of the regular demolition case that had been initiated June 1, and then sent an Emergency Order to Demolish to Mr. Miller and Mr. Jordan the morning of that same day, June 9, 2000. The Emergency Order stated that Mr. Jordan was ordered to vacate and immediately demolish the building. The Order further stated that it was an immediate order to demolish and that the City would hire a contractor to take action if necessary. Once he had the Order, Mr. Miller posted notice on the building that it was going to be demolished and then called contractors soliciting bids for the demolition work. After receiving several bids and selecting the lowest, the building was demolished at approximately 1:15 p.m. on the same day.

The lowest bid secured to demolish Mr. Jordan's building was $12,000. In addition, an administrative charge of $1000 and a fee of $500 to cut off the water were assessed. Thus, the demolition charge and fees assessed against Mr. Jordan's property totaled $13,500. Mr. Jordan has not yet paid any portion of this sum.

Mr. Jordan first acquired the property at 2328 Elmwood with his first wife in 1966. In 1976, Mr. Jordan's first wife transferred her interest in the property to him during the course of their divorce and Mr. Jordan is the sole owner of the property. In 1976, an appliance repair shop and two residential apartments occupied the building, although the building was vacant in the years immediately preceding the demolition. Mr. Jordan moved from Kansas City to Texas in May of 1989 be-

---

5. The school was closed when Mr. Miller inspected the building, although Mr. Miller was unaware of this. In any event, children still played on the playground equipment on school grounds.

cause of a job transfer. Mr. Jordan received the June 9, 2000, Emergency Order to Demolish at his home in Texas on June 14, 2000.

After the demolition and assessment of costs, the City filed a Petition for Recovery of Personal Debt and to Enforce Lien of Special Tax Bill. Mr. Jordan answered and asserted his counterclaim that the City owed him damages for wrongful demolition. The case was tried by the trial judge on March 24, 2003, and judgment was entered April 7, 2003. Mr. Jordan's timely appeal followed. Due to an error in the trial court's transcription equipment, no recording was made of the trial and the case was sent back to the circuit court for rehearing. The matter was reheard on June 10, 2004, and the court entered the judgment in favor of the City and against Mr. Jordan. When Mr. Jordan sought to appeal this second judgment, it was discovered that, while the first judgment had disposed of all four of the City's counts in their petition, the second judgment failed to dispose of Counts III and IV.[6] Thus, because the judgment did not dispose of all the counts, it was not final and appealable. Thereafter, the City dismissed its Counts III and IV. Because the counts not disposed of by the second trial were dismissed, the second judgment became final and appeal is proper.

## Standard of Review

The standard of review for a judge-tried case is governed by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). *Patel v. Pate*, 128 S.W.3d 873, 876 (Mo.App. W.D.2004). The judgment of the trial court will be affirmed unless it is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law. *Id.* The evidence is viewed in the light most favorable to the judgment, and all evidence and inferences to the contrary are disregarded. *Id.* Neither party requested findings of fact or conclusions of law and the trial court did not make any findings of fact. Supreme Court Rule 73.01(c) states: "All fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached." *Lueckenotte v. Lueckenotte*, 34 S.W.3d 387, 394 (Mo. banc 2001).

## Statutory Framework[7]

Section 67.400[8] authorizes cities to enact ordinances providing for vacation and mandatory demolition of buildings, "which are detrimental to the health, safety or

6. The counts were as follows: Count I–Recovery of Personal Debt for the Demolition of the Property; Count II–Request to Enforce Special Tax Lien for the Demolition of the Property; Count III–Request for Recovery of Personal Debts for Weed Abatement on the Property; Count IV–Request to Enforce Liens of Special Tax Bill for Weed Abatement on the Property.

7. Mr. Jordan's building was demolished on June 9, 2000. Non-emergency statutes passed during the regular session of the general assembly, which ends by law in May, do not become effective until August of the same year. Thus, the statutes as they appeared in 1999 control. All statutory references are to RSMo 1994, with the exception of sections

67.400 and 67.410, which are RSMo Cum. Supp.1999.

8. Section 67.400, RSMo Cum.Supp.1999:

The governing body of any city, town, village, or county of the first classification and any county of the first class with a charter form of government may enact orders or ordinances to provide for vacation and the mandatory demolition of buildings and structures or mandatory repair and maintenance of buildings or structures within the corporate limits of the city, town, village or county which are detrimental to the health, safety or welfare of the residents and declared to be a public nuisance.

welfare of the residents and declared to be a public nuisance." Section 67.410.1.3 [9]

9. Section 67.410, RSMo Cum.Supp.1999 (emphasis added):

1. *Except as provided in subsection 3 of this section, any ordinance enacted pursuant to section 67.400, shall:*

(1) Set forth those conditions detrimental to the health, safety or welfare of the residents of the city, town, village, or county the existence of which constitutes a nuisance;

(2) Provide for duties of inspectors with regard to such buildings or structures and shall provide for duties of the building commissioner or designated officer or officers to supervise all inspectors and to hold hearings regarding such buildings or structures;

(3) *Provide for service of adequate notice of the declaration of nuisance, which notice shall specify that the property is to be vacated, if such be the case, reconditioned or removed, listing a reasonable time for commencement; and may provide that such notice be served either by personal service or by certified mail, return receipt requested, but if service cannot be had by either of these modes of service, then service may be had by publication. The ordinances shall further provide that the owner, occupant, lessee, mortgagee, agent, and all other persons having an interest in the building or structure as shown by the land records of the recorder of deeds of the county wherein the land is located shall be made parties;*

(4) Provide that upon failure to commence work of reconditioning or demolition within the time specified or upon failure to proceed continuously with the work without unnecessary delay, the building commissioner or designated officer or officers shall call and have a full and adequate hearing upon the matter, giving the affected parties at least ten days' written notice of the hearing. Any party may be represented by counsel, and all parties shall have an opportunity to be heard. After the hearings, if the evidence supports a finding that the building or structure is a nuisance or detrimental to the health, safety, or welfare of the residents of the city, town, village, or county, the building commissioner or designated officer or officers shall issue an order making specific findings of fact, based upon competent and substantial evidence, which shows the building or structure to be a nuisance and detrimental to the health, safety, or welfare of the residents of the city, town, village, or county and ordering the building or structure to be demolished and removed, or repaired. If the evidence does not support a finding that the building or structure is a nuisance or detrimental to the health, safety, or welfare of the residents of the city, town, village, or county, no order shall be issued;

(5) Provide that if the building commissioner or other designated officer or officers issue an order whereby the building or structure is demolished, secured, or repaired, or the property is cleaned up, the cost of performance shall be certified to the city clerk or officer in charge of finance, who shall cause a special tax bill or assessment therefor against the property to be prepared and collected by the city collector or other official collecting taxes, unless the building or structure is demolished, secured or repaired by a contractor pursuant to an order issued by the city, town, village, or county and such contractor files a mechanic's lien against the property where the dangerous building is located. The contractor may enforce this lien as provided in sections 429.010 to 429.360, RSMo. Except as provided in subsection 3 of this section, at the request of the taxpayer the tax bill may be paid in installments over a period of not more than ten years. The tax bill from date of its issuance shall be deemed a personal debt against the property owner and shall also be a lien on the property until paid.

. . . .

3. *The governing body of any city not within a county and the governing body of any city with a population of three hundred fifty thousand or more inhabitants which is located in more than one county may enact their own ordinances pursuant to section 67.400 and are exempt from subsections 1 and 2 of this section.*

4. Notwithstanding the provisions of section 82.300, RSMo, any city may prescribe and enforce and collect fines and penalties for a breach of any ordinance enacted pursuant to section 67.400 or this section and to punish the violation of such ordinance by a fine or imprisonment, or by both fine and imprisonment. Such fine may not exceed one thousand dollars, unless the owner of the property is not also a resident of the property, then such fine may not exceed two thousand dollars.

states that, except as provided in section 67.410.3, any ordinance enacted pursuant to section 67.400 shall provide for adequate notice, give a reasonable period of time for compliance with the notice, and that all persons having an interest in the property shall be made parties to the proceedings. Section 67.410.3 states that any city "with a population of three hundred fifty thou-

sand or more inhabitants which is located in more than one county [10] may enact their own ordinances pursuant to section 67.400" and is exempt from section 67.410.1, including the provision requiring notice. This provision exempts Kansas City from section 67.410.1 and .2.

Section 67.430.1 [11] requires any ordinances passed pursuant to section 67.400

---

5. The ordinance may also provide that a city not within a county or a city with a population of at least three hundred fifty thousand located in more than one county may seek to recover the cost of demolition prior to the occurrence of demolition, as described in this subsection. The ordinance may provide that if the building commissioner or other designated officer or officers issue an order whereby the building or structure is ordered to be demolished, secured or repaired, and the owner has been given an opportunity for a hearing to contest such order, then the building commissioner or other designated officer or officers may solicit no less than two independent bids for such demolition work. The amount of the lowest bid, including offset for salvage value, if any, plus reasonable anticipated costs of collection, including attorneys' fees, shall be certified to the city clerk or officer in charge of finance, who shall cause a special tax bill to be issued against the property owner to be prepared and collected by the city collector or other official collecting taxes. The municipal clerk or other officer in charge of finance shall discharge the special tax bill upon documentation by the property owner of the completion of the ordered repair or demolition work. Upon determination by the municipal clerk or other officer in charge of finance that a public benefit is secured prior to payment of the special tax bill, the municipal clerk or other officer in charge of finance may discharge the special tax bill upon the transfer of the property. The payment of the special tax bill shall be held in an interest-bearing account. Upon full payment of the special tax bill, the building commissioner or other designated officer or officers shall, within one hundred twenty days thereafter, cause the ordered work to be completed, and certify the actual cost thereof, including the cost of tax bill

collection and attorneys' fees, to the city clerk or other officer in charge of finance who shall, if the actual cost differs from the paid amount by greater than two percent of the paid amount, refund the excess payment, if any, to the payor, or if the actual amount is greater, cause a special tax bill or assessment for the difference against the property to be prepared and collected by the city collector or other official collecting taxes. If the building commissioner or other designated officer or officers shall not, within one hundred twenty days after full payment, cause the ordered work to be completed, then the full amount of the payment, plus interest, shall be repaid to the payor. Except as provided in subsection 2 of this section, at the request of the taxpayer the tax bill for the difference may be paid in installments over a period of not more than ten years. The tax bill for the difference from the date of its issuance shall be deemed a personal debt against the property owner and shall also be a lien on the property until paid.

10. Kansas City is such a city.

11. Section 67.430, RSMo 1994 (emphasis added):

1. *The ordinances shall provide for appeal by the interested parties described in subsection 3 of section 67.410,* from the determination of the building commissioner or designated officer or officers to the circuit court as established in sections 536.100 to 536.140, RSMo, if a proper record as defined in section 536.130, RSMo, is maintained of *the hearing provided by subsection 4 of section 67.410;* otherwise, the appeal shall be made pursuant to the procedures provided by section 536.150, RSMo.

2. In any appeal as provided by this section, any person who owns or occupies property located within one thousand two

to "provide for appeal by the interested parties described in subsection 3 of section 67.410" and refers to the "hearing provided by subsection 4 of 67.410." The meaning of this statute was unclear at trial. Section 67.410.3 does not describe interested parties and section 67.410.4 does not mention a hearing. Instead, section 67.410.3 is the provision exempting Kansas City from section 67.410.1 and .2 and section 67.410.4 concerns fines, penalties, and imprisonment for breaching a ordinance. A close look at the statutory history explains this incongruency. Section 67.410 was revised in 1994. Before its revision, what is currently section 67.410.1.3 was section 67.410.3 and what is currently section 67.410.1.4 was section 67.410.4. Current section 67.410.1.3 is the section requiring all persons with an interest in the property to be joined as parties to the proceedings. These are the interested parties referred to in section 67.430. Current section 67.410.1.4 requires a hearing if the property owner fails to respond to the notice by repairing or demolishing the property. This is the hearing referred to in section 67.430. Section 67.430 was not revised when section 67.410 was in 1994 and has not been subsequently revised. Thus, section 67.430 refers to the old numbering system in section 67.410 and was never changed to reflect the new numbering system. Therefore, section 67.430 requires that the interested parties described in section 67.410.1.3 have the right to appeal from the hearing provided in section 67.410.1.4. As discussed, *supra*, though, Kansas City is exempted from section 67.410.1 and all its subdivisions, including these two.

Section 67.440 [12] states that, in cases "where it reasonably appears there is an immediate danger to the health, safety, or welfare of any person," the city "may take emergency measures to vacate and repair or demolish a dangerous building or structure." Finally, section 67.450 [13] authorizes a cause of action against the city in the case of wrongful demolition. This is the statutory framework authorizing city ordinances with respect to dangerous buildings.

Pursuant to the authority granted in the statutory framework, *supra*, Kansas City has passed several ordinances governing buildings that are detrimental to the health, safety, and welfare of its residents. Chapter 56 of the Kansas City Ordinances [14] is the Property Maintenance

---

hundred feet of the perimeter of the building or structure which is the subject of the suit shall be allowed to present evidence to the court on behalf of the city, town, village or county having a charter form of government, of the condition of the building or structure, whether or not such person presented such evidence at the hearing provided by subsection 4 of section 67.410. The appellant before the court shall have the opportunity to cross-examine any such person presenting evidence to the court.

**12.** Section 67.440, RSMo 1994 (emphasis added):

The ordinances may provide that in cases *where it reasonably appears there is an immediate danger to the health, safety, or welfare of any person,* the building commissioner or designated officer or officers *may take emergency measures to vacate and repair or demolish a dangerous building or structure.*

**13.** Section 67.450, RSMo 1994 (emphasis added):

In the event any building or structure is wrongfully demolished by a city, town, village or county having a charter form of government or is demolished without adhering to the procedures provided in sections 67.400 to 67.450, the city, town, village or county having a charter form of government *shall be liable for damages as determined by a court of law in a suit brought by the party so damaged.*

**14.** All references to the Kansas City Ordinances are to the Kansas City, Mo., Code of

Code. Article V contains the ordinances relating to Dangerous Buildings and Structures. Section 56–531 states that the purpose of Article V is to "implement the provisions of RSMo 67.400 et seq." and authorizes the director of neighborhood and community services to "make and promulgate reasonable and necessary rules and regulations to carry out the provisions of this article." Section 56–532(a) [15] de-

ORDINANCES (1994) unless otherwise provided. Section 56–537, regarding the right to appeal, was revised in 2002; section 56–541, regarding the recovery of costs, was revised in 2000 and 2005. Finally, section 56–542, regarding administrative fees, was revised in 2005. The 1999 versions of these three ordinances are the versions cited. Section 56–546 was passed in 1998.

**15.** Sec. 56–532. Dangerous buildings or structures (emphasis added):

(a) Dangerous buildings defined. All buildings or structures, portions or parts of a building or remains of a building or structure which may have any of the defects enumerated herein or in the building code shall be deemed a dangerous building and a nuisance *provided that such conditions or defects exist to the extent that they are detrimental to the life, health, property, safety or welfare of the public, or its occupants are endangered.* A building is a dangerous building whenever:

(1) The exterior walls or other vertical structural members list, lean or buckle to such an extent that a plumb line passing through the center of gravity does not fall inside the middle one-third of the base.

(2) A portion thereof has wrecked, warped, buckled or settled to such an extent that walls or other structural portions have materially less resistance to winds or snow than is required in the case of similar new construction.

(3) *The building or structure, or any portion thereof, because of dilapidation, deterioration, decay, vandalism or faulty construction or the removal, movement or instability of any portion of the ground necessary for the purpose of supporting such building or the deterioration, decay or inadequacy of its foundation or any other cause is likely to partially or completely collapse.*

(4) The building or structure, exclusive of the foundation, shows substantial damage or deterioration of the supporting or non-supporting members, or enclosing or outside walls or wall coverings.

(5) The building or structure has improperly distributed loads upon the floors or roofs, or in which the same are overloaded or which have insufficient strength to be reasonably safe for the purpose used.

(6) A portion of the building has been damaged by fire, earthquake, tornado, wind, flood, vandals or any other cause, to such an extent that the structural strength or stability thereof is materially less than it was before such catastrophe or damage and is less than the minimum requirements of the building code for similar new construction.

(7) A door, aisle, passageway, stairway, fire escape or other means of egress is not of sufficient width or size, or is damaged, dilapidated, obstructed or otherwise unusable, or so arranged so as not to provide safe and adequate means of egress in case of fire or panic.

(8) *A portion of the building or member or appurtenance thereof (e.g., porch, chimney, signs) is likely to fail, or to become detached or dislodged, or to collapse and thereby injure persons or damage property.*

(9) The building or structure has any portion, member or appurtenance, ornamentation on the exterior thereof which is not of sufficient strength or stability, or is not so anchored, attached or fastened in place so as to be capable of safely resisting wind pressure, or snow or other loads.

(10) The building or structure, because of inadequate maintenance, dilapidation, decay, damage, faulty construction or arrangement, trash, filth, inadequate light, air ventilation or sanitation facilities, or otherwise is determined to be unsafe, unsanitary, unfit for human habitation, or in such a condition that is likely to cause sickness or disease.

(11) *For any reason, the building or structure, or any portion thereof, is manifestly unsafe for the purpose for which it is being used.*

(12) The building or structure or land it occupies exists or is maintained in violation of any specific requirement or prohibition applicable to such building or structure or land provided by this article or other appli-

fines what a dangerous building is and sets forth twenty types or categories of defects that cause a building to be dangerous and subject to demolition. In order to make a determination that a building is dangerous under section 56–532(a), the neighborhood and community services department "would not only have to find there existed in the building one or more of the defects enumerated in § 56–532(a) or the building code, but that such defects were 'detrimental to the life, health, property, safety or welfare of the public, or its occupants are endangered.'" *Woodson v. Kansas City*, 80 S.W.3d 6, 11–12 (Mo.App. W.D.2002)(quoting section 56–533). Section 56–533 [16] sets forth the standards to be used, once a building is found to be dangerous, in ordering vacation, repair or

cable laws or ordinances of this state or city relating to the condition, use, location, maintenance of the building, structures or land.

(13) *The building or structure has become an attractive nuisance to children or is open to unauthorized or unlawful entry.*

(14) The building or structure because of obsolescence, dilapidated condition, deterioration, damage, trash and debris, unsafe exits, lack of sufficient fire-resistive construction, unsafe electrical wiring, gas connections, or heating apparatus, previous fires or any other cause is determined to be a fire hazard or is a fire hazard under chapter 26.

(15) The electrical system is totally or partially damaged, destroyed, removed or otherwise made inoperable, unsafe or hazardous.

(16) The plumbing system is totally or partially damaged, destroyed, removed or otherwise made inoperable or unsanitary.

(17) The mechanical system or any portion of the mechanical system is totally or partially damaged, destroyed, removed or otherwise made inoperable or unsafe.

(18) *The building or structure, because of obsolescence, dilapidated condition, deterioration or damage, is detrimental to the sale, loan or taxable values of surrounding properties or which renders such surrounding properties uninsurable or which constitutes a blighting influence upon the neighborhood or which constitutes an eyesore so as to deprive owners or occupants of neighboring property of the beneficial use and enjoyment of their premises or which presents an appearance which is offensive to persons of ordinary sensibilities.*

(19) The building or structure is in such condition as to constitute a public nuisance known to the common law or in equity jurisprudence.

(20) A portion of a building or structure remains on a site when construction or demolition work is abandoned.

(b) Dangerous buildings, nuisance. Any building or structure found to be a dangerous building is hereby declared to be a public nuisance.

(c) Party defined. The owner, occupant, lessee, mortgagee, agent or any person having an interest in a building or structure, as shown by the land records of the recorder of deeds or director of records of the county wherein the land is located.

16. Sec. 56–533. Standards for vacation, repair or demolition (emphasis added):

In any case where a building or structure is found to be a dangerous building, the following standards shall be used by the director of neighborhood and community services in ordering vacation, repair or demolition:

(1) If the dangerous building is in such condition as to make it dangerous to the health, morals, safety or general welfare of the public or the occupants, it shall be ordered vacated.

(2) If the dangerous building can reasonably be repaired so that it will no longer exist in violation of the terms of this article or the building code, it shall be ordered repaired. An order to repair may include a requirement to close and secure any or all exterior openings in accordance with section 56–317.

(3) *In any case where a dangerous building is damaged, decayed or deteriorated to a degree that it is not economically feasible to rehabilitate such building, or the building is not structurally safe, the building or any portion thereof shall be ordered demolished.* An order to demolish may include a requirement to close and secure any or all exterior openings in accordance with section 56–317 until demolition can be accomplished.

demolition and section 56–534 [17] sets forth the duties of the inspectors. Section 56–535 [18] requires an order to be issued to all parties with an interest in a building deemed dangerous, sets forth the information that must be included in the order, and requires that the order be served upon all parties. Section 56–536 [19] requires no-

17. Sec. 56–534. Duties (emphasis added):

(a) Duties of the inspectors. The inspectors' duties shall include but not be limited to the following. The inspectors shall:

(1) Inspect any building or portion thereof or any structure which is or may be existing in violation of this article. Identify the conditions listed in section 56–532 which are present.

(2) Report to the director of neighborhood and community a services all buildings, structures or portions thereof deemed to be an emergency as defined in section 56–540.

(3) Identify all parties as defined in section 56–532(c).

(4) Estimate the value of the property and cost of all repairs needed to bring the building or structure into compliance with this code and other city ordinances.

(5) Report to the director of neighborhood and community services any noncompliance with the order issued pursuant to section 56–535.

(b) Duties of director of neighborhood and community services. The director of neighborhood and community services shall:

(1) Review all available information relating to the building or structure in question. If the director deems it necessary to the performance of duties and responsibilities imposed herein, the director may request that an inspection and report be made to the director by the city engineer, the city architect, the department of codes administration, the fire department, the police department, the health department, or by any other city department, or may contract for services of an expert whenever the director deems such services necessary.

(2) Following the review, make written findings of fact as to whether the building or structure in question is a dangerous building and a public nuisance.

(3) Issue an order based upon the findings of fact, ordering the owner or other parties to vacate, close and secure, repair or demolish such building or structure if found to be a dangerous building.

(4) *Cause a building or structure which has been determined to be a dangerous building to be vacated, repaired or demolished as ordered* or have the dangerous building temporarily closed as provided in section 56–317, if the owner or parties fail to comply with the order of the director.

(c) Duties of the city attorney. The city attorney's duties shall include but not be limited to the following:

(1) Within the proper exercise of discretion, prosecute all persons failing to comply with the terms of the orders provided for herein.

(2) Within the proper exercise of discretion, bring suit to collect all municipal liens, assessments or costs incurred by the director of neighborhood and community services in causing "dangerous buildings" to be vacated, secure, repaired or demolished.

(3) Take such other legal action as is necessary to carry out the terms and provisions of this article.

18. Sec. 56–535. Order:

The director of neighborhood and community services shall issue an order to all parties of a building or structure determined to be a dangerous building.

(1) The order shall contain the written findings of fact which caused the building to be determined to be a dangerous building. In accordance with the findings of fact, the order shall require the owner, or other parties, to vacate, close and secure, repair or demolish the building. The order shall allow up to 30 days for compliance. The order shall advise all parties of the right to appeal as provided in section 56–537.

(2) The order shall be served upon all parties by regular United States mail or by personal service. If the party a to whom such order is addressed cannot be found after diligent effort to do so, service may be made upon such party by posting the order on the building or structure described in the order.

19. Sec. 56–536. Posting notice on building (emphasis added):

(a) A notice of the dangerous condition of a building shall be posted on any building determined to be a dangerous building. *The notice shall contain the words, "Warning, Dangerous Building, DO NOT ENTER," followed by text authorized by the director of neighborhood and community services.*

tice of dangerous condition to be posted on a building deemed dangerous. Section 56–537 [20] mandates that, except in the case of an emergency, the parties may appeal the determination that a building is dangerous. These provisions regulate dangerous buildings in the ordinary course of events.

In emergency situations, however, ordinances make different provisions. Section 56–540(a) [21] defines an emergency as "any case where it reasonably appears there is immediate danger to the health, safety or welfare of any person because of a dangerous condition which exists in violation of this article." Section 56–540(b) grants the director of neighborhood and community services the power to take emergency measures, including "power to cause the immediate vacation of any building and the summary correction of any emergency condition which exists in violation of this article, including but not limited to demolition of dangerous buildings." Further, section 56–540(c) states that the emergency order is not appealable and that "such order shall not be reviewed or stayed other than by the circuit court of the county in which the premises is located on which the emergency condition exists." Finally, section 56–540(d) provides that the costs incurred in abating the dangerous condi-

(b) Any person removing such sign shall be guilty of an ordinance violation and upon conviction thereof shall be punished as set forth in section 56–545.

(c) No person shall enter a building that has been posted as provided above unless such entry is authorized by the director of neighborhood and community services. This does not prevent entry by the owner or an agent of the owner for the purpose of repair or demolition. Any person entering a building without authorization shall be guilty of an ordinance violation and upon conviction shall be punished as set forth in section 56–545.

**20.** Sec. 56–537 (former sec. 20.132) Right of appeal (emphasis added):

*Except in emergencies,* any decision of the director of neighborhood and community services in the enforcement of this article may be appealed *to the property maintenance appeals board by any person aggrieved by any decision of the director of neighborhood and community services. Such appeal must be taken within ten (10) days from the date of the order or other ruling appealed by filing with the director of neighborhood and community services a written notice of appeal setting forth the grounds therefor. Before the board is called, the appellant shall pay a fee of thirty dollars ($30.00), payable to the city treasurer. The director of neighborhood and community services shall then transmit to the board all papers constituting the record of the case.

*Except in emergencies,* as set out in section 20.135, an appeal to the board stays all enforcement of the determination from which the appeal is being taken.

**21.** Sec. 56–540. Emergencies (emphasis added):

(a) Emergency defined. For the purpose of this article, *an emergency is hereby defined as any case where it reasonably appears there is immediate danger to the health, life, safety or welfare of any person because of a dangerous condition which exists in violation of this article.*

(b) Authority. *In any emergency case, the director of neighborhood and community services shall have the power to take emergency measures to abate or to correct such dangerous condition. The emergency power herein granted shall include power to cause the immediate vacation of any building and the summary correction of any emergency condition which exists in violation of this article, including but not limited to demolition of dangerous buildings.*

(c) Emergency order not appealable. *No appeal to the property maintenance appeals board shall lie from an emergency order, and such order shall not be reviewed or stayed other than by the circuit court of the county in which the premises is located on which the emergency condition exists.*

(d) Costs of abatement. The costs of emergency abatement shall be recovered as provided in section 56–541 for the recovery of costs.

tions shall be recovered as provided in section 56-541.

Section 56-541 [22] provides for the city's recovery of costs incurred in "vacating, closing and securing, repairing or demolishing a dangerous building" through a special tax bill against the real property affected which is also deemed a personal debt against the owner. Section 56-542 [23] states that the costs assessed against the property owner shall include, "in addition to the actual cost of repair, demolition, water service cut, sewer capping, boarding and all other necessary security measures, a charge for administrative costs associated with the abatement action." The section further provides that the charge for administrative costs shall not be higher than $1000.00. Section 56-546 [24] states that, if

**22.** Sec. 56-541. Recovery of costs:

(a) The costs incurred by the city in vacating, closing and securing, repairing or demolishing a dangerous building, including the cost of administering the provisions of this article, shall be certified by the director of neighborhood and community services to the director of finance as a special assessment represented by a special tax bill against the real property affected.

(b) No special tax bill shall be issued if the building or structure is demolished, secured or repaired by a contractor pursuant to an order issued by the city and such contractor files a mechanic's lien against the property where the dangerous building is located. The contractor may enforce this lien as provided in RSMo 429.010 to 429.360.

(c) No special tax bill shall be issued when federal funds are being used which are subject to a prohibition of recovery by a special assessment process. The proof of such exception shall be the burden of any person asserting it.

(d) The special tax bill from the date of its issuance shall be deemed a personal debt against the owner and shall also be a lien on the property until paid. The tax bill shall be payable within 60 days after the date of issuance without interest, and thereafter with interest from the date of its issue until paid at either the minimum rate of nine percent per annum or the rate payable on ten-year United States treasury notes as established at the last auction before the particular assessment is certified to the director of finance plus two percent, whichever is greater. The city may initiate actions to collect against the owner if payment in full is not received within 60 days. The lien may be enforced by any method appropriate for the enforcement of special assessments generally.

(e) The special tax bill may be paid in installments over a period of not more than ten years. When payments are current, the interest rate for installments on tax bills shall be equal to the rate on ten-year United States treasury notes as established at the last auction before the particular assessment is certified to the director of finance. When payments are not current, the interest rate shall be two percent higher. Should any such installment become delinquent, the whole unpaid amount shall become due.

**23.** Sec. 56-542 (former sec. 20.137) Administrative fee:

The charge for demolition of any building or structure shall include, in addition to the actual cost of repair, demolition, water service cut, sewer capping, boarding and all other necessary security measures, a charge for the administrative costs associated with the abatement action. The director of neighborhood and community services will calculate the administrative costs on an annual basis and set the fee accordingly, but the fee shall not be higher than one thousand dollars ($1,000.00).

**24.** Sec. 56-546. Recovery of costs prior to demolition:

(a) In any case where a building or structure is found to be a dangerous building and ordered demolished, the director of neighborhood and community services may solicit no less than two independent bids for such demolition work. The amount of the lowest bid, including offset for salvage value, if any, plus reasonable anticipated costs of collection, including attorney's fees, shall be certified to the director of finance, who shall cause a special tax bill to be issued against the property owner to be prepared and collected by the city.

(b) The director of finance shall discharge the special tax bill upon documentation by

demolition work is required, the City shall solicit at least two independent bids and select the lowest bid proffered.

## Notice and Hearing

In his first point on appeal, Mr. Jordan contends that the city failed to give him proper notice that his building had been declared a dangerous building, why it was dangerous, and that he was required to vacate, close and secure, repair, or demolish the building. He claims the failure to give proper notice denied him a hearing or the opportunity to correct the dangerous situation, pursuant to section 67.400, and, thus, deprived him of due process of law.

▆▆▆ Through section 67.400, the State has delegated its police power to the City. The City has used the power given to it by section 67.400 to enact the ordinances relating to dangerous buildings. "Generally, the function of the police power has been held to promote the health, welfare, and safety of the people by regulating all threats either to the comfort, safety, and welfare of the populace or harmful to the public interest." *Craig v. City of Macon*, 543 S.W.2d 772, 774 (Mo. banc 1976). Building regulations by a municipality are an exercise of the police power. *State ex rel. Walmar Inv. Co. v. Mueller*, 512 S.W.2d 180, 185 (Mo.App.1974). "Enforcement of the property maintenance ordinances is a valid exercise of the City's police powers." *Jordan v. City of Kansas City*, 972 S.W.2d 319, 324 (Mo.App. W.D. 1998). In ordering and executing the demolition of Mr. Jordan's building, the City was exercising its police power. *Woodson*, 80 S.W.3d at 9–10.

[The] police power in its final analysis is nothing more nor less than the power to govern and in all cases where a matter is affected with a public interest a sovereign is authorized to exercise the police power. Such power is incapable of exact definition, but the existence of it is essential to every well ordered government. This is so for the reason that the police power of a state is that power which is necessary for its preservation and without which it cannot serve the purpose for which it was formed. As has been well said, the police power of a state may be shortly defined to be the power of the legislature to make such regulations relating to personal and property rights as appertain to the public health, the public safety, and the public morals. These principles are so well known that it is unnecessary to cite the authorities.

the property owner of the completion of the demolition work. Upon determination by the director of finance that a public benefit is secured prior to payment of the special tax bill, the director of finance may discharge the special tax bill upon the transfer of the property.

(c) The payment of the special tax bill shall be held in an interest-bearing account. Upon full payment of the special tax bill, the director of neighborhood and community services shall, within 120 days thereafter, cause the ordered work to be completed, and certify the actual cost thereof, including the cost of tax bill collection and attorney's fees, to the director of finance who shall, if the actual cost differs from the paid amount by greater than two percent of the paid amount, refund the excess payment, if any, to the payor. If the actual amount is greater than the amount paid, the director of finance shall cause a special tax bill or assessment for the difference against the property to be prepared and collected by the city. The tax bill for the difference may be paid in installments over a period of not more than ten years and, from the date of its issuance, it shall be deemed a personal debt against the property owner and shall also be a lien on the property until paid.

(d) If the director of neighborhood and community services shall not, within 120 days after full payment, cause the ordered work to be completed, then the full amount of the payment, plus interest, shall be repaid to the payor.

*U.S. v. Asher*, 90 F.Supp. 257, 258 (W.D.Mo.1950). The police power may be exercised to protect public health and safety. *Women's Kansas City St. Andrew Soc. v. Kansas City, Mo.*, 58 F.2d 593, 599 (8th Cir.1932). In fact, "the preservation of the public health is a paramount end of the exercise of the police power of the state." *Mahoney v. Doerhoff Surgical Servs., Inc.*, 807 S.W.2d 503, 507 (Mo. banc 1991).

▮ "Every citizen holds his property subject to the valid exercise of the police power." *State ex rel. State Highway Comm'n. v. Meier*, 388 S.W.2d 855, 859 (Mo. banc 1965). Where public safety and welfare, as well as peace and health are involved, the sovereign may abridge, abrogate, impair, or even *destroy* property. *Asher*, 90 F.Supp. at 259 (emphasis added).

> [E]very citizen holds his property subject to the valid exercise of the police power, and that in the event of a conflict between his individual interests and those of society as a whole, he must subordinate his private rights to a reasonable and proper exercise of the police power for the promotion and furtherance of what is conceived to be the general welfare.

*Nemours v. City of Clayton*, 237 Mo.App. 497, 175 S.W.2d 60, 65 (1943). The police power extends to legislative definitions of acts constituting public nuisances. *Clutter v. Blankenship*, 346 Mo. 961, 144 S.W.2d 119, 121 (1940).

▮ A city is a creature of the state and, as such, has no inherent police power. *State ex rel. Sims v. Eckhardt*, 322 S.W.2d 903, 906 (Mo.1959). The only police power a city has is that conferred to it by the state. *XO Mo., Inc. v. City of Maryland Heights*, 362 F.3d 1023, 1027 (8th Cir. 2004). "The state expresses its grant of such powers via our state constitution and statutes." *Woodson*, 80 S.W.3d at 10. A city's exercise of police power delegated to it by the State "must conform to the terms of the statutory grant." *Moore v. City of Parkville*, 156 S.W.3d 384, 387 (Mo.App. W.D.2005). With respect to whether an ordinance is fairly referable to a legitimate exercise of police power, "[t]he test, as stated by the Missouri Supreme Court in *Bellerive*, is whether the expressed requirements or regulations of an ordinance have a substantial and rational relation to the health, safety, peace, comfort and general welfare of the inhabitants of the municipality." *City of Blue Springs v. Gregory*, 764 S.W.2d 101, 103 (Mo.App. W.D.1988)(citing *Bellerive Inv. Co. v. Kansas City*, 321 Mo. 969, 13 S.W.2d 628, 634 (1929)).

▮ The police power, while broad, is not unlimited; it cannot lessen the protections contained in the United States Constitution. *Women's Kansas City St. Andrew Soc.*, 58 F.2d at 598. "[T]he exercise of the police power cannot be made a cloak under which to overthrow or disregard constitutional rights." *Graff v. Priest*, 356 Mo. 401, 201 S.W.2d 945, 951 (1947). "The police power is limited by: (1) the rights guaranteed by the Constitution, (2) the necessity of a legitimate public purpose, and (3) a reasonable exercise of the power." *President Riverboat Casino-Mo., Inc. v. Mo. Gaming Comm'n*, 13 S.W.3d 635, 641 (Mo. banc 2000). "The test used to decide the validity of a state's police power is one of reasonableness. The exercise of police power will be upheld if any state of facts either known or which could be reasonably assumed afford support for it." *Tgb, Inc. v. City of St. Louis Bd. of Bldg. Appeals*, 154 S.W.3d 353, 356 (Mo.App. E.D.2004) (citations and quotation marks omitted).

▮ "Statutes enacted under the police power for the protection of the pub-

lic health or safety, for the prevention of fraud and for the public welfare, must have some substantial relation to those objects." *Poole & Creber Market Co. v. Breshears*, 343 Mo. 1133, 125 S.W.2d 23, 27 (1938). "From its very nature the police power is a power to be exercised within wide limits of legislative discretion and if a statute appears to be within the apparent scope of this power the courts will not inquire into its wisdom and policy, or undertake to substitute their discretion for that of the legislature." *Id.* at 27–28.

The Fourteenth Amendment to the United States Constitution prohibits a state from depriving "any person of ... property, without due process of law." Article I, § 10 of the Missouri Constitution provides "[t]hat no person shall be deprived of ... property without due process of law." The meaning of procedural due process has been well established. In order for the requirements of due process to be met, parties whose rights are to be affected must be given notice and the opportunity to be heard. *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972). The notice and opportunity to be heard must be at a meaningful time and in a meaningful manner. *Id.*

 "Due process is flexible and calls for such procedural protections as the particular situation demands." *U.S. v. Shelton Wholesale, Inc.*, 34 F.Supp.2d 1147, 1151 (W.D.Mo.1999)(quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14 n. 15, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978)(quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972))). "Due process analysis requires the balancing of three competing interests: (1) the private interest that will be affected by official action; (2) the risk of erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional safeguards;

and (3) the government's interest." *Clark v. Bd. of Dirs. of Sch. Dist. of Kansas City*, 915 S.W.2d 766, 771 (Mo.App. W.D.1996)(quoting *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976)).

The constitutional right to be heard is a basic aspect of the duty of government to follow a fair process of decisionmaking when it acts to deprive a person of his possessions. The purpose of this requirement is not only to ensure abstract fair play to the individual. Its purpose, more particularly, is to protect his use and possession of property from arbitrary encroachment—to minimize substantively unfair or mistaken deprivations of property, a danger that is especially great when the State seizes goods simply upon the application of and for the benefit of a private party. So viewed, the prohibition against the deprivation of property without due process of law reflects the high value, embedded in our constitutional and political history, that we place on a person's right to enjoy what is his, free of governmental interference.

The requirement of notice and an opportunity to be heard raises no impenetrable barrier to the taking of a person's possessions. But the fair process of decision making that it guarantees works, by itself, to protect against arbitrary deprivation of property. For when a person has an opportunity to speak up in his own defense, and when the State must listen to what he has to say, substantively unfair and simply mistaken deprivations of property interests can be prevented. It has long been recognized that "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights.... (And n)o better instrument has been devised for arriving at truth than to give a person in jeopar-

dy of serious loss notice of the case against him and opportunity to meet it." *Fuentes,* 407 U.S. at 80–81, 92 S.Ct. 1983 (citations omitted).

 "[T]he Court has traditionally insisted that, whatever its form, opportunity for that hearing must be provided before the deprivation at issue takes effect." *Id.* at 82, 92 S.Ct. 1983. The requirement that a hearing take place before the deprivation of property does not apply in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Id.* at 82, 92 S.Ct. 1983.

> There are 'extraordinary situations' that justify postponing notice and opportunity for a hearing. These situations, however, must be truly unusual. Only in a few limited situations has this Court allowed outright seizure without opportunity for a prior hearing. First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force; the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance.

*Id.* at 90–91, 92 S.Ct. 1983 (citations omitted); *see also Moore v. City of Park Hills,* 924 S.W.2d 301, 303 (Mo.App. E.D.1996). The Supreme Court has allowed the seizure of property without the opportunity for a hearing prior to the seizure in several situations, including those involving collecting the internal revenue of the United States, assisting the war effort, warding off bank failure, and protecting the public from misbranded drugs and contaminated foods. Further, "courts have upheld city ordinances which require police to tow illegally parked, abandoned, and unregistered vehicles before the owners are notified or provided an opportunity for a hearing." *Moore,* 924 S.W.2d at 303 (citations omitted).

If an extraordinary or emergency situation does not exist, a hearing must be provided before a deprivation of property occurs and a subsequent hearing will not satisfy due process. *See Id.* at 304; *U.S. v. James Daniel Good Real Prop.,* 510 U.S. 43, 44, 62, 114 S.Ct. 492, 496, 505, 126 L.Ed.2d 490 (1993). "We tolerate some exceptions to the general rule requiring predeprivation notice and hearing, but only in extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *James Daniel Good Real Prop.,* 510 U.S. at 53, 114 S.Ct. 492 (citations and quote marks omitted).

As elaborated, *supra,* a state may use the police power to protect the safety and general welfare of the public. In section 67.400,[25] the state delegates this power to local entities. Kansas City used this delegated power to enact the ordinances located in article V of chapter 56. On June 1, 2000, when the initial inspection was done, Mr. Miller observed some serious prob-

---

**25.** At trial, Mr. Jordan's first point indicates that the lack of notice and opportunity to correct afforded to him was a violation of this statutory provision. This section does not speak to notice or such an opportunity at all; it simply allows Kansas City, and other local entities, to pass ordinances requiring the va-

cation and demolition of buildings that are dangerous to public health, safety, or welfare. In his argument section, it becomes clear that Mr. Jordan is complaining that the ordinances enacted by Kansas City, pursuant to section 67.400, violate his due process rights.

lems with Mr. Jordan's building.[26] These problems did not pose an immediate threat to the public, though. Because no emergency existed, the procedures for a normal demolition were begun. Under these procedures, Mr. Jordan would have received notice pursuant to section 56–535 and would have been able to appeal the determination that his building was dangerous pursuant to section 56–537. The paperwork associated with this process had been started and submitted to Mr. Benner.

The situation changed on June 9, 2000, however. Upon returning to the location, Mr. Miller discovered that Mr. Jordan's building presented an emergency situation. In the intervening days, the situation had become "seriously worse." Both the statute, section 67.440, and the ordinance, section 56–540, define an emergency as "an immediate danger to the health, life, safety or welfare of any person." Mr. Miller and Mr. Benner determined that Mr. Jordan's building posed an immediate danger to the public. As such, the emergency procedures in section 56–540 became the governing procedures for the demolition of Mr. Jordan's building.

■ Under section 56–540 no pre-demolition notice is required. While section 540(c) does suggest an Emergency Order is required, no language requires that the Order be received by the property owner before action is taken. This conclusion is reached giving the ordinance its plain and ordinary meaning, *City of Sugar Creek v. Reese*, 969 S.W.2d 888, 891 (Mo.App. W.D. 1998), and because section 540(b) authorizes *immediate* vacation and *summary* correction of the emergency situation. If

notice were required under the ordinance in emergency situations, having a separate provision for emergencies and the language allowing immediate vacation and summary correction would be meaningless and superfluous. Section 56–540(c) explicitly provides that no right to appeal the decision exists. Section 540(c) contemplates Mr. Jordan seeking a restraining order in circuit court precluding the city from proceeding, however. Thus, the City correctly followed its ordinances when it demolished Mr. Jordan's building.

The question then becomes, do these emergency procedures afford Mr. Jordan proper due process? Under the Kansas City Ordinances, no opportunity exists in an emergency situation for notice to the property owner or hearing before the city acts. This does not mean that the ordinances violate due process, however. Adequate post-deprivation remedies will satisfy due process requirements if the deprivation is a loss of property interest, as opposed to a loss of a life or liberty interest. *Davis v. City of Kinloch*, 752 S.W.2d 420, 424 (Mo.App. E.D.1988). In order for this to be true, there must be some sort of "exigent circumstances requiring quick and summary action followed by a hearing.... However, in the absence of an emergency condition, the existence of a subsequent hearing will not satisfy due process requirements where property deprivation is involved." *Id.*

*Fuentes* provided a three-prong test to determine if a situation is so extraordinary so as to allow notice and opportunity for a hearing to be postponed. *Fuentes*, 407 U.S. at 90–91, 92 S.Ct. 1983. The first

---

**26.** Mr. Jordan disputed that his building was in a state of disrepair and claimed the City actually demolished it on June 6, 2000. He presented several witnesses who testified that the building was in a stable and good condition. However, as no findings of fact were made, this court will assume the facts were found in accordance with the trial court's decision. As the trial court found in favor of the City, this court assumes that the building was in a state of disrepair and the demolition occurred on June 9, 2000.

prong is whether "the seizure has been directly necessary to secure an important governmental or general public interest." *Id.* The interest secured by section 56–540 is that of protecting the public from buildings that pose an immediate threat to the safety, health, or welfare of the public. In this case, the parapet on Mr. Jordan's building was moving forward toward the public street and sidewalk on an hourly basis. Further, two of the walls were in danger of imminent collapse onto the public street and sidewalk. Demolishing Mr. Jordan's building was necessary to secure the interest of public safety. Thus, the first prong is met. The second prong is whether "there had been a special need for very prompt action." *Id.* Mr. Jordan's building was determined to be in *imminent* danger of collapse and thus prompt action was required. This point is further illustrated by the speed with which the City acted. The City did not delay in demolishing the building; it acted quickly to abate what it considered an immediate danger. This prong is also met. The final prong is whether the state kept strict control over its monopoly of legitimate force and whether the person initiating the seizure was a "government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance." *Id.* Examination of the statutory scheme, *supra*, makes apparent that this prong was met. In addition, both Mr. Benner and the Fire Marshall concurred in the finding that Mr. Jordan's building posed an immediate danger and that the situation was an emergency. Thus, the ordinance and the facts of this case meet the *Fuentes* test.

"[T]he necessity of quick action by the State and the impracticability of providing any meaningful pre-deprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirement of procedural due process." *Mitchell v. Vill. of Edmundson,* 891 S.W.2d 848, 850 (Mo.App. E.D.1995)(holding that due process was not violated when a city towed a car that was blocking a roadway because blocking a roadway was an exigent circumstance and the city provided a post-deprivation remedy in a municipal court hearing)(quoting *Parratt v. Taylor,* 451 U.S. 527, 539, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)). In this case, the City needed to demolish Mr. Jordan's building as quickly as possible to abate the risk to the public. There was not time for a hearing before the demolition. Mr. Jordan has meaningful means by which to assess the propriety of the State's action, though. He has exercised them and continues to exercise them here. Section 67.450 provides Mr. Jordan the right to sue the City for damages if the City failed to follow statutory procedures or wrongfully demolished his building. *See Schildknecht v. Dir. of Revenue, State of Missouri,* 901 S.W.2d 348 (Mo.App. E.D.1995)(noting that the United States Supreme Court held, in *Dixon v. Love,* 431 U.S. 105, 115, 97 S.Ct. 1723, 1729, 52 L.Ed.2d 172 (1977), that a statutory scheme permitting the summary deprivation of a driving privilege without a hearing based on objective statutory criteria involving public safety does not violate due process if a full, post-deprivation hearing is available to challenge the suspension). Mr. Jordan exercised this right. He is now appealing the determination by a trial court that the City did not wrongfully demolish his building or fail to follow its procedures.

 The court's language in *Harris v. City of Akron,* 20 F.3d 1396, 1404 (6th Cir.1994), is insightful. The court noted that, in an emergency situation, "the only

available course of action for removing the threat to public health and safety was to carry out the demolition forthwith. Under these circumstances, there [is] no opportunity for notice and a predeprivation process." The reason for this is that "[a]n erroneous determination that no emergency existed would [result] in the very threat to the public that the code was intended to prevent." *Id.* The court noted that, if the City had followed the non-emergency procedures, the public would have been exposed to danger. "Under these circumstances, it [is] impracticable to wait for a predeprivation process to run its course." *Id.*

Mr. Jordan also complains that the Emergency Order to Demolish did not set forth specifically why his building had been declared a dangerous building. Mr. Jordan relies on *Woodson v. City of Kansas City*, 80 S.W.3d 6 (Mo.App. W.D.2002), for the proposition that the Emergency Order to Demolish must contain "findings of fact and conclusions of law as to the specific conditions or defects that existed which caused appellant's building to be a dangerous building necessitating demolition." Appellant's Brief, page 15. Mr. Jordan argues that the notice he received on June 14, 2000, did not comply with *Woodson* or section 56–535.1.[27]

Mr. Jordan did not raise this issue at trial; therefore, he is limited to seeking plain error review. Rule 84.13(c); *Cohen v. Express Fin. Servs., Inc.*, 145 S.W.3d 857, 864 (Mo.App. W.D.2004). "As a practical matter, we rarely resort to plain error review in civil cases." *Cohen*, 145 S.W.3d at 865. Plain error review should only be used where "the error affected substantial rights and a manifest injustice or miscarriage of justice resulted therefrom." *Ruzicka v. Ryder Student Transp. Servs., Inc.*, 145 S.W.3d 1, 15 (Mo. App.S.D.2004). Plain error does not mean prejudicial error; "plain error places a much greater burden on [the party asserting it] than an assertion of prejudicial error [does]." *Davolt v. Highland*, 119 S.W.3d 118, 135–36 (Mo.App. W.D.2003).

Even had Mr. Jordan preserved the issue for appellate review, his claims are without merit. First, both *Woodson* and section 56–535 deal with regular demolitions of dangerous buildings; they do not involve emergency situations. As explained, *supra*, this was an emergency situation and the emergency procedures governed. *Woodson* held that section 56–535(1), which requires orders to demolish buildings "contain the written findings of fact that caused the building to be determined to be a dangerous building," mandates that all orders to demolish contain findings of fact as to why the City declared the building at issue to be dangerous, using and listing the criteria in section 56–532(a). Section 56–535 regulates what must be in an order in regular demolition situations; in an emergency situation, however, section 56–540 governs. Thus, *Woodson* interpreted an ordinance that does not apply in emergency situations. Because of this, *Woodson* and section 56–535 are inapplicable to this case. In an emergency situation, Mr. Jordan was not entitled to any notice, only a post-deprivation remedy. He cannot complain that the notice he received after the fact was not detailed enough.

**27.** Mr. Jordan also complains that the notice did not comply with section 67.400. As observed in a previous note, this section does not speak to notice or such an opportunity at all; it simply allows Kansas City, and other local entities, to enact ordinances requiring the vacation and demolition of buildings that are dangerous to public health, safety, or welfare. In his argument section, it becomes clear that Mr. Jordan is complaining that about the ordinances enacted by Kansas City, pursuant to section 67.400.

■ Even assuming, *arguendo,* that the Emergency Order to Demolish must have had detailed findings of fact and conclusions of law, Mr. Jordan has not met the heavy burden imposed by plain error review. No prejudice resulted, let alone manifest injustice because Mr. Jordan had actual knowledge that his building was going to be demolished. "Proof of prejudice is necessary if a denial of due process is to be made out." *In re Jones,* 431 S.W.2d 809, 819 (Mo. banc 1966)(quoting *Napue v. People of State of Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)). "Generally, a party who has actual notice is not prejudiced by and may not complain of the failure to receive statutory notice." *Graves v. City of Joplin,* 48 S.W.3d 121, 124 (Mo.App. S.D.2001)(holding that appellant who received actual notice of a hearing to determine whether a building he had a claim to was a dangerous building and should be demolished could not complain that he did not receive the required statutory notice). Statutes imposing technical notice requirements "should not be strictly enforced where the party seeking enforcement had actual notice and cannot show prejudice as a result of the failure to follow the technical requirements." *Id.*

Mr. Jordan asserted that he "was informed on June 6 by his brother-in-law that the building was being torn down." Mr. Jordan testified at trial that he had actual notice of the demolition on June 6, 2000; this is three days before the demolition occurred. He stated numerous times at trial that his brother-in-law drove by the property on June 6 and observed the demolition sticker on the door that warned people to stay out of the building. When asked by his attorney at trial what kind of sign was on the building, Mr. Jordan stated that his brother-in-law told him that a sign was on the building about "some kind of demolition." Once he received actual notice, Mr. Jordan failed to take any steps to stop the process, such as seeking a restraining order in circuit court.

The point is denied.

### Validity of Ordinance 56–540

■ In his second point on appeal, Mr. Jordan contends that Kansas City Ordinance section 56–540 fails to comply with section 67.430 in that it fails to provide for a full evidentiary hearing. Thus, he asserts that ordinance section 56–540 is invalid.

Mr. Jordan first argues that section 67.430.1 requires the ordinances to provide for an appeal by interested parties "described in subsection 3 of section 67.410" and a hearing "provided by subsection 4 of section 67.410." As noted, *supra,* this statutory provision is confusing because no interested parties are mentioned in section 67.410.3 and no hearing is mentioned in section 67.410.4. This confusion is cleared by looking at the statutory history of section 67.410 and section 67.430. Section 67.430 was not revised when section 67.410 was in 1994 and has not been subsequently revised. Thus, section 67.430 refers to the old numbering system in section 67.410 and was never changed to reflect the new numbering system. Therefore, section 67.430 requires that the interested parties described in section 67.410.1.3 have the right to appeal from the hearing provided in section 67.410.1.4. As discussed, *supra,* Kansas City is exempted from section 67.410.1 and all its subdivisions, including these two. Because Kansas City is exempted from these two provisions, it is logical that Kansas City is exempted from all of section 67.430 as well.

This conclusion is supported by the entire statutory scheme. In the case of an emergency, no pre-deprivation notice or hearing is required. This does not violate due process as long as an emergency ex-

ists and a meaningful post-deprivation remedy is provided. Section 67.430 states in essence that interested parties may appeal a determination by the City that a building is dangerous. This appeal is meant to give the parties an opportunity to have judicial review of the City's determination before the building is demolished. In an emergency situation, the judicial review is provided after the building is demolished. This judicial review comes in the form Mr. Jordan used, through a suit for wrongful demolition. Further, section 56–540(c) provides that the emergency order may be reviewed by the circuit court of the county in which the premises are located. Thus, section 67.430 does not apply to emergency situations; but even it if did, the ordinance allows for judicial review.

Mr. Jordan next complains that the Emergency Order to Demolish received on June 14, which was dated June 9, 2000, suggested that he had the chance to correct the situation himself. His building had already been demolished at that time. The Order does indicate that the property owner will have the opportunity to correct the situation. The Order also states, however, that the City may take further action, without further notice, if necessary. Given the danger posed by Mr. Jordan's building on June 9, the City properly used its police power and demolished the building immediately. Further, as discussed, *supra*, no prior notice was required, so Mr. Jordan cannot complain that he did not have the opportunity to act before the City demolition occurred. Mr. Jordan had a prior opportunity to act by maintaining his building; he failed to do that, a dangerous situation arose, and the City acted to protect the public. This action, without prior

notice, was proper. Finally, Mr. Jordan states that he knew of the demolition on June 6, 2000. He had three days in which to act and he failed to do so.

Mr. Jordan relies on *Goe v. City of Mexico*, 64 S.W.3d 836 (Mo.App. E.D. 2001), for the proposition that section 67.410.1 requires cities to have a full and adequate hearing for affected parties before deprivation of property. His claim is correct, unless the city is exempted from section 67.410.1 by section 67.410.3, which Kansas City is. *Goe* involved the City of Mexico, which is not exempted from section 67.410.1. Thus, *Goe* is not applicable to this case.

The point is denied.

### Compensation

In his third point on appeal, Mr. Jordan contends that the city wrongfully demolished his building by failing to adhere to the procedures provided in section 67.450 [28] and that he should be compensated for the damages that resulted from the wrongful demolition. Mr. Jordan cites a variety of cases to support his position that the city wrongfully demolished his building. All of the referenced cases deal with takings, however. The City in this case exercised its police power; it did not effect a taking. "A valid exercise of the police power is not a taking of private property for public use." *Pac. Fire Prot. Dist. v. Mosley*, 939 S.W.2d 467, 470 (Mo.App. E.D.1996)(citing *State v. Pub. Serv. Comm'n.*, 369 S.W.2d 572, 575 (Mo.1963)); *see also Angoff v. Holland–Am. Ins. Co. Trust*, 937 S.W.2d 213, 218 (Mo.App. W.D. 1996). The City properly exercised its police power in this situation. Mr. Jordan

---

**28.** Mr. Jordan states that City failed to follow the procedure in section 67.450. Section 67.450 merely provides that a property owner may sue for wrongful demolition. Mr. Jor-

dan, however, attempts to use section 67.450 to complain that the City failed to follow its statutes in section 67.400 *et seq.* and wrongfully demolished his building.

is not challenging the determination that his building created an emergency situation or posed an imminent threat of harm to the public. Thus, an imminent threat to the public existed and the City acted quickly to abate it. Adequate post-deprivation remedies were provided to satisfy due process requirements, and this was not a taking.

The point is denied.

### Conclusion

As this was an emergency situation posing an imminent threat to the public, no notice or hearing was required before the City exercised its police power, and Mr. Jordan was provided a meaningful post-deprivation remedy. The City's demolition of Mr. Jordan's building was proper and the judgment is affirmed.

All concur.