**Paul DAMON and Natalia Olinetchouk, on behalf of Themselves and all others Similarly Situated, Appellants,**

v.

**CITY OF KANSAS CITY, Missouri and American Traffic Solutions, Inc., Respondents.**

**No. WD 75363.**

Missouri Court of Appeals,
Western District.

Nov. 26, 2013.

Application to Transfer to Supreme Court Denied Dec. 24, 2013.

Application for Transfer Denied
Feb. 25, 2014.

Ryan A. Keane, St. Louis, MO and Mitchell I. Burgess, Kansas City, MO, for appellants.

Chad Stewart, Kansas City, MO, for respondent City of Kansas City.

Jane E. Dueker, St. Louis, MO for respondent American Traffic Solutions.

Before Division Three: CYNTHIA L. MARTIN, Presiding Judge, JOSEPH M. ELLIS, Judge and GARY D. WITT, Judge.

GARY D. WITT, Judge.

Paul Damon ("Damon") and Natalia Olinetchouk ("Olinetchouk"), on behalf of themselves and others similarly situated, appeal the trial court's dismissal of their class action petition for declaratory relief, injunctive relief, and damages against the City of Kansas City and American Traffic Solutions, Inc. We hold that the ordinance is invalid because it conflicts with state law. We further hold that Damon and Olinetchouk are not barred from asserting their claims. The judgment is reversed and the cause remanded.

## FACTUAL AND PROCEDURAL HISTORY [1]

This class-action lawsuit questions the validity of an ordinance (and corresponding notices of violations) governing a municipality's automated traffic control signals, commonly referred to as red-light cameras. Appellants Damon and Olinetchouk brought suit in the Jackson County Circuit Court against the City of Kansas City (the "City") and the company with which it contracts, American Traffic Solutions ("ATS") (collectively, "Respondents").[2]

Appellants seek declaratory relief, injunctive relief and damages from the municipality *and* from ATS, which set up and operates the traffic enforcement cameras. ATS is a private, for-profit company that markets, installs, operates, and/or maintains red-light camera products and services to municipal governments throughout the country.

The petition includes two subclasses of plaintiffs (collectively, "Appellants" or the "subclasses"). Subclass One, consisting of Damon and others similarly situated, received a Notice of Violation and paid the fine and costs without going to court. Subclass Two, consisting of Olinetchouk and others similarly situated, received a Notice of Violation but have not paid the fine or tried the underlying municipal case and currently face prosecution.[3]

1. Because the trial court granted Respondents' motion to dismiss this matter on the pleadings, we view the facts as set forth in the petition as true and construe the facts alleged liberally in favor of the plaintiff. *Dujakovich v. Carnahan*, 370 S.W.3d 574, 577 (Mo. banc 2012).

2. Respondents filed a joint brief.

3. At oral argument, the City alerted this court that *after* this action was filed in the circuit

court and the trial court ruled on the motion to dismiss, the City dismissed the ordinance violation against Olinetchouk but did not dismiss the action against the other members of Subclass Two. The City did not indicate that it intends to dismiss the ordinance violations against the remainder of the class and makes no argument as to the continued viability of their claims. We note that no class has yet been certified, given the procedural posture of the case. "Missouri courts consistently recognize a certified class may subsequently be

Appellants allege that ATS and the City *together* install, maintain, and operate the red-light cameras and that *together* they enforce red-light camera citations, though it is further alleged that sometimes ATS alone determines whether a violation has occurred and causes a citation to be issued. It is further alleged that ATS encourages a guilty plea, paying fine, plus paying a "convenience fee" via its private website (the "fastest and easiest way to pay") for $4 or by way of a toll-free "customer service" number for $4. The Notice of Violation also states, "If you have any questions, please call Customer Service" at the listed toll-free number, which is operated by ATS with ATS employees answering the phones.

The city ordinance governing automated traffic control systems is section 70–961.[4] As set out fully below, the ordinance creates a "rebuttable presumption" that the owner of a motor vehicle captured by the camera is the operator. Also at issue is a provision of the ordinance that provides as follows: "Upon the filing of an information in the municipal division of the circuit court the court administrator shall issue a Summons, with a court date established, pursuant to Missouri Supreme Court Rule 37." Appellants allege that in practice, the court date was not always established on the Notice.

Also, as set out further below, additional contested ordinance language provides in part: "No vehicle shall be *driven* into an intersection controlled by a traffic control signal at which an automated traffic control system is installed while the traffic control signal facing the vehicle displays a steady red signal.…" (emphasis added). Appellants allege that because of this language, a violation of this ordinance constitutes a moving violation and thus must be governed by state law rather than by an ordinance. Also, Appellants allege:

> The Ordinance, despite Defendants' attempts to make it appear civil, is criminal in nature because the Ordinance seeks to regulate and prosecute violations predicated solely on failure to obey traffic signals, violations that are criminal under Missouri law, and/or is criminal in effect because the Ordinance authorizes arrest as a mechanism for enforcing the Ordinance.

As notification that he violated the ordinance, Damon was issued solely a Notice of Violation, and Olinetchouk was issued both a Notice of Violation and a Summons. The documents in both cases included instructions for paying the fine or for submitting an affidavit either that a person other than the owner was the driver of the vehicle or that the notice was otherwise received in error. The style of Damon's Notice of Violation read:

> Kansas City Missouri
> Photo Enforcement Program
> **PO Box 22081**
> **Tempe, AZ 85285–2091**

(Emphasis added.)

As noted above, Damon's Notice of Violation encouraged online payment of the fine to an ATS-run website (www.violationinfo.com)—and required an additional $4 "convenience fee" for the privi-

---

modified or decertified later before a decision on the merits." *Ogg v. Mediacom, LLC*, 382 S.W.3d 108, 116 (Mo.App. W.D.2012) (internal quotations and citations omitted). "Rule 52.08, therefore, charges the circuit court with the duty to monitor its class certification order in light of the evidentiary developments in the case." *Id.* The City cannot avoid the potential class action by merely dismissing the ordinance violation against the named member of the class.

4. The City amended its ordinance effective November, 2012; the version described herein was in effect at the time the Appellants received their notices of violation.

lege of paying the fine online or by way of a toll-free number, a fee that appears to be retained by ATS but is unclear from the record before us. The Notice of Violation also included a form to mail in payment of the fee—again, not to an address in the city of Kansas City or even in Missouri—but to a post office box in Cincinnati, Ohio, leased to ATS. Damon's Notice of Violation also had a provision for rental-car companies to mail information identifying the party who had rented the car to a post office box in Tempe, Arizona that was leased to ATS. It also included the toll-free "Customer Service" number for "any questions" about payment, operated by ATS with ATS employees answering the phones.

The Notice of Violation—again, nowhere delineated "Summons"—mailed to Damon stated that if he wished to "dispute this notice or *plead not guilty* " (emphasis added), the owner was not to send payment, and a "Summons" would appear in the mail. But Damon's Notice of Violation also instructed him to contact the City by way of a municipal website (www.kcmo.org/court) or by way of a local Kansas City telephone number to request a court date to plead not guilty, stating that "[i]f you fail to pay or set a court date, you will be summoned to court on a date certain. Your failure to appear at that time may result in the issuance of a *warrant for your arrest* and further penalties" (emphasis added).

Olinetchouk's documents included a separate "Summons" and indicated she should appear on the scheduled court date set forth in the Summons if she wished to dispute the notice or *plead not guilty.* Olinetchouk's Summons stated also: "Your

failure to appear on the date below may result in the issuance of a *warrant for your arrest* and further penalties" (emphasis added). Olinetchouk's documents allowed online payment through the same ATS-run website as Damon's with the same "convenience fee." The address for mailing payment or a not guilty plea under Olinetchouk's documents was the address of the City's municipal division of the Sixteenth Judicial Circuit Court, but it included the ATS Tempe, Arizona address for rental-car companies. It also included the "Customer Service" toll-free number operated by ATS for any questions regarding payment.

The documents provided to both subclasses indicate that "no points will be assessed" for a violation of this ordinance. The ordinance provides for a fine in the amount of $100. Damon's documents provide that the "Penalty is a Fine and Costs of $100," while Olinetchouk's documents provide "Penalty is a Fine of $100" but makes no mention of "costs." [5]

Relevant to this appeal, Appellants further allege the following:

—"ATS is the first party to receive and review images of potential red light camera violations before sending those images to KC police officers, who then issue a citation in the form of a Notice of Violation."

—"[T]here are times when [City's] police officers do not review these images to determine whether a violation has actually occurred, which results in employees of ATS, not officers of the law, determining whether a violation occurred and then issuing a citation."

---

5. In a supplement to the legal file, the City included documents to support its argument that the action against Olinetchouk had been dismissed and therefore she was no longer a proper party. *See supra* note 3. These documents also indicate that Olinetchouk had been subject to an arrest warrant for her offense prior to its dismissal.

—Respondents have "exploited to engage in an underhanded practice of persecuting and bilking Missourians under the guise and pretext of a public safety program."

—In bringing the class action, the Subclasses "seek to expose what they and other Missouri citizens believe is an unscrupulous business venture between an out-of-state for profit corporation and a municipal government seeking new ways to fill city coffers."

—Elected representatives of the City have admitted that the purpose behind the camera program is to "make money" but that "most of the income from the fines are [sic] going to the vendor, [ATS]."

—Both Respondents "deliberately circumvented Missouri state laws intended to keep dangerous drivers off the road . . . at the peril of Missouri citizens" in that the ordinance "does not actually promote public safety because Defendant KC has converted misdemeanor moving violations into non-moving infractions to avoid reporting guilty pleas and convictions, which means that no driver will ever be assessed points and removed from the road for what KC calls public safety violations."

" '[I]njury wrecks, rear-end wrecks and overall wrecks all increased' after Defendants installed the cameras" because cameras increase crashes and injuries; cameras do little or nothing to reduce accidents due to distracted or drunk drivers, which are at the root of many red-light violations.

—The cameras "replace live police officers——whose purpose is to enforce the laws and who can combat all crimes not just red light violations—with automatons capable of only one purpose: photograph the backside of vehicles in order to funnel revenue to KC and ATS." In that vein, the subclasses also allege that the program "requires pulling police officers off the street and placing them in front of a computer to review red light camera images," and, therefore, there are fewer officers on the street. The subclasses also allege that, unlike officers, the cameras do not stop drunk drivers who run red lights.

—Better traffic engineering is more effective and efficient than red-light cameras.

—The City opted to implement a "rear-only" system rather than a system with multiple cameras, which could capture images of the driver, because it was less expensive and because a single-camera system was the most "cost-effective means of turning a profit at the expense of Missourians."

—Sometimes ATS receives "well over 50%" of each fine paid, and the Federal Highway Administration states that 'where a private contractor is responsible for the processing of citations, compensation based on the number of citations should be avoided' because that system invites corruption and undermines fair administration of justice.

—The City deliberately and unlawfully misclassified moving violations of red-light signals as "non-moving infraction[s]" without assessing points against a driver's license.

—ATS had secured legal advice from the law firm of Stinson Morrison Hecker on whether municipalities possess the authority to adopt an ordinance that would permit circumvention of the Missouri Department of Revenue's point system found in Chapter 302.[6] The legal advice concluded, *inter alia:*

---

**6.** Section 302.302.1(1) requires the Director of Revenue to assess two points against the driver's license of any person convicted of a moving violation of a municipal traffic ordi-

[W]e do not believe a constitutional charter city or statutory city, town or village could adopt an ordinance which circumvents the Director of Revenue's point system for the suspension and revocation of motor vehicle licenses without legislative authorization to do so. The mandatory language used in the text of the statute [section 302.225 [7]] *supports a conclusion that an ordinance of this nature would conflict with state law.* This conclusion is augmented also by the clear legislative intent to broaden this reporting requirement to any court with jurisdiction over any offense committed involving a vehicle, as seen in the General Assembly's recent amendment of § 302.225.

(Emphasis added.)

\* \* \* \* \* \*

In seeking declaratory relief, injunctive relief, and damages, Appellants raise a number of contentions regarding the constitutionality of the ordinance. The petition is composed of six counts.

In Count I, Appellants seek a declaratory judgment that the ordinance is contrary to a number of Missouri statutes and/or to the Missouri Constitution. Specifically, Appellants contest the validity of the ordinance and seek a declaratory judgment on: (a) whether the ordinance was void because it conflicts with Missouri statutes regulating traffic (primarily section 304.281.1); (b) whether the City had the authority to enact the ordinance; (c) whether the ordinance is an additional rule of the road or traffic regulation and accordingly conflicts with state law; (d) whether Respondent(s) circumvented Missouri law mandating points for moving violations (sections 302.225, 302.302, 302.010(13)); (e) whether Respondents(s) have authority to reclassify a violation of a steady red-light signal from a moving violation under state law to a non-moving infraction; (f) whether it is lawful for the City to create a rule of evidence by establishing liability based on vehicle ownership; (g) whether Respondent(s) can lawfully prosecute vehicle owners if the owner was not driving at the time of the offense; (h) whether the ordinance and/or Respondent(s)'s conduct violates Article I, section 19 of the Missouri constitution by compelling testimony to prove innocence; (i) whether the ordinance violates Article 1, section 10 of the Missouri constitution in depriving Appellants of life, liberty, or property without due process of law; (j) whether the ordinance is invalid because it exists to generate revenue; (k) whether the ordinance and/or Respondents' conduct violates public policy; (*l*) whether Subclass One is entitled to recover payments made pursuant to the ordinance if the ordinance is found to be void or unlawful.

In Count II, Subclass One alleges unjust enrichment against the City on the premise that the ordinance is "void, invalid, and/or unconstitutional" and accordingly seeks a return of "fines, costs, and fees" paid by class members.

---

nance or regulation. Section 302.225.1 requires a municipal court to notify the Director of Revenue of any conviction for a moving violation. Section 71.010 requires that municipal ordinances be in conformity with state statutes.

Sections 302.302 and 302.304 instruct the Director of Revenue to establish a point system for traffic violations and provide for the suspension or revocation of an individual's driver's license due to accumulation of points within a certain period of time. *Brown v. Dir. of Revenue,* 97 S.W.3d 82, 84 (Mo.App. S.D. 2002) (citation omitted). "The statutes grant the Director no discretion from revoking the driving privileges where the accumulation of points meets the statutory amount." *Id.*

7. All statutory references are to RSMo 2000 as currently supplemented unless otherwise indicated.

In Count III, Appellants seek legal damages and equitable relief based on an alleged violation of Article I, section 19 of the Missouri Constitution, which prohibits self-incrimination, on the basis that the accused are compelled to testify by sworn statement or appear in court. (This allegation was duplicated in Count I, but the relief requested distinguishes the two counts.)

In Count IV, Appellants seek legal damages and equitable relief based on an alleged violation of Article I, section 10 of the Missouri Constitution, which prohibits the deprivation of life, liberty, or property without due process of law by establishing an unreasonable presumption of guilt and shifting the burden of proof. (This allegation was duplicated in Count I, but the relief requested distinguishes the two counts.)

In Count V, Appellants seek legal damages based on a "civil conspiracy" against both Respondents to generate revenue illegally, which is premised on the assertion that Respondents knew and discussed the likelihood or potential that the ordinance was "void, unlawful, and/or unconstitutional."

In Count VI, Subclass One seeks legal damages and equitable relief, alleging unjust enrichment against ATS for receiving money paid pursuant to an ordinance that is "unlawful, void, conflict[s] with Missouri state law, and violate[s] the Missouri constitution for multiple reasons."

The trial court entered its written judgment dismissing the petition with prejudice, without explanation or analysis.

Further facts are set forth below as necessary.

## OUR JURISDICTION

■ We note first that this case involves a challenge to the constitutionality of a municipal ordinance. Although not raised by the parties, we have a duty to examine our jurisdiction *sua sponte. Walker v. Brownel,* 375 S.W.3d 259, 261 (Mo.App. E.D.2012). If we lack jurisdiction to entertain an appeal, we must dismiss it. *Id.*

■ The Missouri Supreme Court has exclusive appellate jurisdiction in cases involving the validity of a statute or provision of the constitution of this state. Mo. CONST. ART. V, § 3. We have general appellate jurisdiction in all cases not within the exclusive jurisdiction of the Missouri Supreme Court. *Id.*

Under prior decisions, appellate review of the constitutionality of a municipal ordinance fell exclusively in the Supreme Court. *See, e.g., Marshall v. Kansas City,* 355 S.W.2d 877, 879 (Mo. banc 1962). "Jurisdiction of the appeal is in the supreme court since the constitutionality of the municipal ordinance was within the issues of law tendered by the pleadings and decided by the trial court." *Id. See also Kansas City v. Hammer,* 347 S.W.2d 865, 867 (Mo. banc 1961). More recently, however, the Supreme Court has determined that the initial review of the constitutionality of municipal ordinances is proper in the Court of Appeals, noting that "[c]laims that municipal ordinances are constitutionally invalid are not within the exclusive appellate jurisdiction of this Court." *Alumax Foils, Inc. v. City of St. Louis,* 939 S.W.2d 907, 912 (Mo. banc 1997). The court further observed, "[w]e may, of course, review such claims on transfer." *Id.* (citing Mo. CONST. ART. V, § 10). "Under our constitutional scheme, however, the court of appeals has the jurisdiction initially to consider such issues on appeal." *Id; see also State ex rel. Chastain v. City of Kansas City,* 289 S.W.3d 759, 763 (Mo.App. W.D.2009).

■ As we are bound to follow the most recent Supreme Court precedent, jurisdic-

tion over the validity and constitutionality of an ordinance now lies with this court. *State v. Brightman*, 388 S.W.3d 192, 199 (Mo.App. W.D.2012)

## STANDARD OF REVIEW

"The standard of review for a trial court's grant of a motion to dismiss is *de novo.*" *Lynch v. Lynch*, 260 S.W.3d 834, 836 (Mo. banc 2008) (citation omitted). When reviewing "the dismissal of a petition for failure to state a claim, the facts contained in the petition are treated as true and they are construed liberally in favor of the plaintiffs." *Id.* (quoting *Ste. Genevieve Sch. Dist. R–II v. Bd. of Aldermen of Ste. Genevieve*, 66 S.W.3d 6, 11 (Mo. banc 2002)). "If the petition sets forth any set of facts that, if proven, would entitle the plaintiffs to relief, then the petition states a claim." *Lynch*, 260 S.W.3d at 836 (citation omitted). In our review, "[n]o attempt is made to weigh any facts alleged as to whether they are credible or persuasive." *Richardson v. Richardson*, 218 S.W.3d 426, 428 (Mo. banc 2007) (cita-

tion omitted). "Instead, the petition is reviewed in an almost academic manner, to determine if the facts alleged meet the elements of a recognized cause of action, or of a cause that might be adopted in that case." *Id.* "In so doing, a plaintiff's averments are taken as true and all reasonable inferences are liberally construed in favor of the plaintiff." *Devitre v. Orthopedic Center of St. Louis, LLC*, 349 S.W.3d 327, 331 (Mo. banc 2011) (citation omitted).

## ANALYSIS [8]

■■■ On appeal, Appellants and Respondents both briefed in considerable detail the validity of the ordinance, seeking a declaration of either its constitutionality and/or its general lawfulness from this court. Where the question can be addressed as a matter of law, we resolve the dispute. Otherwise, our review is merely whether the petition states a claim for relief, and, under that standard, the judgment of the trial court dismissing the action must be reversed on several grounds.

---

8. Respondent City did not raise the issue of sovereign immunity in the joint Respondents' brief with ATS, though the record indicates the issue was raised before the trial court. We nonetheless note that Appellants' petition sufficiently alleges facts that, at this juncture, survive the application of the doctrine.

Key to this issue is that a municipality has sovereign immunity from actions founded in common law tort in all but four cases:

(1) where a plaintiff's injury arises from a public employee's negligent operation of a motor vehicle in the course of his employment (section 537.600.1(1)); (2) where the injury is caused by the dangerous condition of the municipality's property (section 537.600.1(2)); (3) where the injury is caused by the municipality performing a proprietary function as opposed to a governmental function; and (4) to the extent the municipality has procured insurance, thereby waiving sovereign immunity up to but not beyond the policy limit and only for acts covered by the policy (section 537.610).

*Brooks v. City of Sugar Creek*, 340 S.W.3d 201, 206 (Mo.App. W.D.2011). While a municipality enjoys sovereign immunity from actions at common law tort undertaken "as part of the municipality's governmental functions-actions benefiting the general public, ... municipalities have no immunity for torts while performing proprietary functions-actions benefiting or profiting the municipality in its corporate capacity." *Brooks*, 340 S.W.3d at 205. Put another way, the City does not enjoy sovereign immunity if its conduct in question constituted a "proprietary function" rather than a "governmental function." *Phelps v. City of Kansas City*, 371 S.W.3d 909, 912 (Mo.App. W.D.2012).

Here, the subclasses pled facts that impact the government's proprietary function. Throughout the pleadings, Appellants allege that the red-light camera program was established purely as a money-making scheme and that it negatively impacts public safety. Thus, the facts as alleged at this juncture survive a sovereign immunity challenge where applicable.

■ As noted above, the trial court neither provided its reasons nor its analysis of the basis for granting the motion to dismiss. "Where the trial court does not state a basis for dismissal, we presume it was based on the grounds alleged in the motion to dismiss, and we will affirm if the dismissal is proper under any of the grounds stated in the motion." *White v. White*, 293 S.W.3d 1, 7 (Mo.App. W.D. 2009). Respondents argued below and on appeal that Appellants are barred from bringing Count I (declaratory judgment action challenging the ordinance on numerous statutory and constitutional grounds), Count III (violation of Article I, section 19, which prohibits compelling a defendant to testify), and Count IV (violation of Article I, section 10, which prohibits deprivation of "life, liberty or property without due process of law") because those counts involve constitutional claims. Specifically, as to those claims, Respondents argue that Subclass One lacks standing, that Subclass One has waived those claims, that Subclass One is estopped from bringing those claims, and that Subclass Two has an adequate remedy at law. As to Counts II (Subclass One's claim for unjust enrichment against City) and Count VI (Subclass One's claim for unjust enrichment against ATS), Respondents argue that Subclass One failed to state a claim upon which relief can be granted and that Subclass One's claims are barred by the voluntary payment doctrine. The parties do not address Appellants' Count V (civil conspiracy) on appeal and therefore it is waived.

### THRESHOLD ISSUES [9]

As noted above, Counts I, III, and IV raise constitutional challenges and/or questions regarding the lawfulness of the ordinance. Respondents argue on appeal that Subclass I does not have standing to bring these claims, that Subclass One has waived and/or is estopped from bringing these claims, and that Subclass Two has an adequate remedy at law.

### A. Standing (Subclass One)

■ While the members of Subclass One argue that they have standing to bring these claims, Respondents argue that there is no standing to bring an action for a declaratory judgment or a violation of either of two constitutional provisions. Many of Respondents' arguments as to standing blur into waiver arguments, which we address *infra*. As to the pure issue of standing, we hold that Subclass One has established that it has standing to bring these claims.

■ Standing is question of law, and review is therefore *de novo*. *Mo. State Med. Ass'n v. State*, 256 S.W.3d 85, 87 (Mo. banc 2008). We determine standing based on the petition and any other non-contested facts accepted as true by the parties at the time of the motion to dismiss. *White*, 293 S.W.3d at 8. "Reduced to its essence, standing roughly means that the parties seeking relief must have some personal interest at stake in the dispute, even if that interest is attenuated, slight or remote." *St. Louis Ass'n of Realtors v. City of Ferguson*, 354 S.W.3d 620, 622–23 (Mo. banc 2011) (citation omitted). "To assert standing successfully, a plaintiff must have a legally protectable interest." *Id.* (citation omitted). A legally protectable interest exists only where a plaintiff is affected directly and adversely by the challenged action or where the plaintiff's interest is conferred statutorily. *Id.*

---

9. Count I also raises several issues involving the lawfulness of the ordinance in light of competing statutes. The sufficiency of the allegations in the petition to permit those allegations to withstand a motion to dismiss are discussed *infra*.

Damon and others similarly situated have established standing in two ways. First, as to Count I, Subclass One seeks declaratory relief pursuant to section 527.020, which states as follows: "a person whose rights, status or other legal relations are affected by a ... *municipal ordinance* ... may have determined any question of construction or validity arising under the ... ordinance ... and obtain a declaration of rights, status or other legal relations thereunder" (emphasis added). Thus, standing is conferred by the plain language of the statute under which Count I is brought. *See Miller v. City of Manchester*, 834 S.W.2d 904, 906 (Mo.App. E.D.1992).

Second, as to the declaratory judgment and also as to Counts III and IV, members of Subclass One have already paid fines. These fines (or a fine and costs) of $100[10] went to the City *and* to ATS, and some class members paid an addition a $4 "convenience fee" to ATS ultimately under the threat of a "warrant for your arrest and further penalties" under an ordinance that—in order to retain its civil character—cannot impose an "affirmative disability or restraint on the individual but merely ... a fine." *City of Creve Coeur v. Nottebrok*, 356 S.W.3d 252, 258 (Mo.App. E.D.2011) (holding a similar ordinance was civil in nature where it did not include the threat of an arrest warrant) (overruled in part on other grounds); *Unverferth v. City of Florissant*, No. 98511, 419 S.W.3d 76, 91, 2013 WL 4813851, at *9 (Mo.App. E.D. Sept. 10, 2013) (holding under similar facts that plaintiffs had standing where they alleged deficiencies in the notice of violation). Certainly Appellants allege that arrest was authorized, and additionally the notice provided to Subclass One threatened that a warrant and arrest would occur if the fine was not paid or Subclass One failed to appear in court. Moreover, the allegations raised in the petition in this case are not limited to an attack on the procedures by which Subclass One could challenge the Notice of Violation. Rather, the due process arguments encompass the City's failure to provide proper notice of a court date on the Notice of Violation or adequate notice of how to contest the alleged violation. As such, we reject Respondents' argument that Subclass One lacked standing to challenge the constitutionality of the ordinance because its members did not avail themselves of the procedure established therein. *See Unverferth*, 419 S.W.3d at 87, 2013 WL 4813851, at *5 (distinguishing *Mills v. City of Springfield*, No. 2:10–CV–04036–NKL, 2010 WL 3526208 (W.D.Mo. Sept. 3, 2010) on the ground that the *Unverferth* plaintiffs raised arguments challenging utter lack of notice); *accord Edwards v. City of Ellisville*, No. 99389, —— S.W.3d ——, ——, 2013 WL 5913628, at *1 (Mo.App. E.D. Nov. 5, 2013).

Noting anew that standing is established even where a party's "interest is

---

10. Certain court costs are required by state statute to be assessed on municipal court violations. See Chapter 488. It is unclear from the record whether these required costs are properly being assessed on these offenses as the notice to Subclass One provided that the "Penalty is a Fine and Costs of $100," while the notice to Subclass Two provided that the "Penalty is a Fine of $100" but makes no mention of "costs," how much they are, or when/if they are assessed or paid.

There is no statutory authorization for an assessment of a fee or court cost for the $4 convenience fee. The rule in criminal as in civil cases is that the recovery and allowance of costs rests entirely on statutory authority and that no right to or liability for costs exists in the absence of statutory authorization. Such statutes are penal in their nature and are to be strictly construed. *Cramer v. Smith*, 350 Mo. 736, 168 S.W.2d 1039, 1040 (1943) (citation omitted).

attenuated, slight or remote," *Ferguson,* 354 S.W.3d at 622–623, we determine that Subclass One has alleged a personal stake in the dispute so as to survive Respondents' motion to dismiss as to standing.

## B. Waiver and Estoppel (Subclass One)

Respondents argue that Subclass One waived any constitutional objections because they were not raised at the earliest possible opportunity, and that Subclass One should be estopped to bring this challenge because the members did not do so before the municipal court, opting instead to pay their fine voluntarily. We address these arguments together and find them unpersuasive.

■ "There are stringent procedural requirements regarding the raising and preservation of constitutional issues." *MB Town Center, LP v. Clayton Forsyth Foods, Inc.,* 364 S.W.3d 595, 603 (Mo.App. E.D.2012). "A party asserting the unconstitutionality of a statute or ordinance bears the burden of supporting that contention by at least relating his argument to the statute or ordinance and issue at hand." *Callier v. Dir. of Revenue,* 780 S.W.2d 639, 641 (Mo. banc 1989) (citation omitted). "It is firmly established that a constitutional question must be presented at the earliest possible moment 'that good pleading and orderly procedure will admit under the circumstances of the given case, otherwise it will be waived.'" *St. Louis Cnty. v. Prestige Travel, Inc.,* 344 S.W.3d 708, 712 (Mo. banc 2011) (citation omitted).

■ As Subclass One did not raise any challenge to the constitutionality of the ordinance before the municipal court, we are faced now with whether its members have sufficiently alleged facts that would overcome the waiver doctrine as to the claims alleging constitutional matters, Counts I, III, and IV. "The critical ques-

tion in determining whether waiver occurs is whether the party affected had a *reasonable opportunity* to raise the unconstitutional act or statute by timely asserting the claim before a *court of law.*" *State ex rel. York v. Daugherty,* 969 S.W.2d 223, 225 (Mo. banc 1998) (citing *Callier,* 780 S.W.2d at 641) (emphases added).

■ Per *Daugherty,* in determining whether Subclass One stated a claim upon which relief can be granted, we note first the allegations in the petition regarding lack of proper notice so as to prevent a "reasonable opportunity" to challenge the constitutionality of the ordinance in a "court of law." 969 S.W.2d at 225. "[A]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (citations omitted). "The fundamental requisite of due process of law is the opportunity to be heard." *Id.* (citation omitted). "This right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." *Id.*

■ Missouri courts have likewise held that "[c]onstitutional due process requires that for a judgment entered against a party not in default to be valid, there must have been notice of the trial setting and an opportunity to be heard must have been granted at a *meaningful time* and in a *meaningful manner.*" *Kerth v. Polestar Entm't,* 325 S.W.3d 373, 379 (Mo.App. E.D. 2010) (emphases added) (citing *Breckenridge Material Co. v. Enloe,* 194 S.W.3d 915, 921 (Mo.App. E.D.2006) and *Midwest*

*Grain & Barge v. Poeppelmeyer,* 295 S.W.3d 211, 213 (Mo.App. E.D.2009)).[11] "Due process also requires that in order to deprive a person of a property interest, the government must give notice and provide an opportunity for a hearing appropriate to the nature of the case." *Dabin v. Dir. of Revenue,* 9 S.W.3d 610, 615 (Mo. banc 2000) (citation omitted).

■ With those principles in mind, we confront the critical question of whether Subclass One had a "reasonable opportunity" to raise its constitutional challenges before a "court of law." *Daugherty,* 969 S.W.2d at 225. As alleged in the petition, the Notice of Violation for Subclass One is in conflict with Rule 37. To begin, the style on the notice indicates that the enforcing jurisdiction is in Tempe, Arizona, and nowhere does it state the address of the municipal court in Kansas City, Missouri, per Rule 37.33(a)(1). Moreover, the City failed to include a Summons and therefore Subclass One was not, *inter alia,* commanded to appear before a court at a stated time and place per Rule 37.42. The Notice of Violation encouraged online payment of the fine to a website run by ATS and it included that additional $4 "convenience fee" to pay through that website or by way of a toll-free number. The Notice of Violation also included a form to mail in payment to a post office box in Cincinnati, Ohio, and it had a provision for rental-car companies to mail information identifying the party who had rented the car caught by the camera to a post office box in Tempe, Arizona.

Pursuant to the Notice of Violation, if Damon wished to "dispute this notice or plead not guilty," then he was instructed to not send payment and to await a Summons in the mail. But to confuse matters, in addition to instructing him to await a Summons with a court date, Damon's notice also indicated that he should contact the City to request a court date. As noted above, the notice stated further: "If you fail to pay or set a court date, you will be summoned to court on a date certain. Your failure to appear at that time may result in the issuance of a warrant for your arrest and further penalties." *See Smith v. City of St. Louis,* 409 S.W.3d 404, 412–13 (Mo.App. E.D.2013) (determining that the City of St. Louis's notices of violations of its red-light camera ordinance were in conflict with Rule 37 and therefore violative of procedural due process); *Unverferth,* 419 S.W.3d at 88, 2013 WL 4813851,

---

11. We acknowledge throughout this opinion the allegations in the petition that the ordinance is criminal in nature and not quasi-criminal or quasi-civil. "A charging document satisfies the guarantees of the Fifth and Sixth Amendments 'if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *State v. Miller,* 372 S.W.3d 455, 466 (Mo. banc 2012) (quoting *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) (internal citations omitted)). "Every information or indictment puts the defendant on notice, for due process purposes, of all offenses included in the offense charged." *Miller,* 372 S.W.3d at 466 (quoting *State v.*

*Hibler,* 5 S.W.3d 147, 150 (Mo. banc 1999)). "A criminal defendant, 'as a matter of due process, is entitled to notice of the charges against him and may not be convicted of any offense of which the information or indictment does not give him fair notice.'" *Miller,* 372 S.W.3d at 466 (quoting *State v. Goddard,* 649 S.W.2d 882, 889 (Mo. banc 1983)).

Despite Appellants' allegations that the ordinance is criminal and not quasi-criminal or quasi-civil, much of our resolution of this issue turns on precedent in the civil context because an ordinance of this nature thus far has been deemed only quasi-criminal and also because the threshold issues are resolved favorably to Appellants even under the lower standard. *See Kansas City v. Bott,* 509 S.W.2d 42, 45 (Mo. banc 1974).

at *6 (holding under very similar facts that plaintiffs had not waived nor were estopped to argue the matter where they alleged deficiencies in a notice of violation); *Cf. Edwards*, —— S.W.3d at ——, 2013 WL 5913628, at *8 (holding that plaintiffs had waived their claims in part because the notices of violation clearly informed alleged violators how to obtain a hearing).

Given the detailed allegations regarding the various and contradictory avenues of correcting or defending against the alleged threats—paying an allegedly criminal fine and a convenience fee under a municipal ordinance by way of *a private company's website*, mailing a payment to a *post office box* in *Ohio* or *Arizona*, contacting the City to set a court date, or waiting for a Summons to be mailed—Subclass One has advanced sufficient allegations to survive a motion to dismiss as to whether it had a "reasonable opportunity" to raise its constitutional challenges before a "court of law." Therefore, we determine that Subclass One did not waive its right (nor are its members estopped) to raise constitutional challenges in a court of law in this action.

### C. Inadequate Remedy at Law (Subclass Two) [12]

Respondents argue that Subclass Two cannot state a claim for declaratory relief because the members have an adequate remedy at law by way of a municipal court proceeding. However, some of the claims raised by Subclass Two are equitable in nature. Upon review of the grant of the motion to dismiss, we agree with Subclass Two and reverse.

■ The general rule is that "equity will not intercede if there is an adequate remedy at law." *Hammons v. Ehney*, 924 S.W.2d 843, 847 (Mo. banc 1996). In Count I, Subclass Two seeks injunctive and declaratory relief. "Issuance of an injunction is an equitable remedy." *Inman v. Mo. Dep't of Corr.*, 139 S.W.3d 180, 185 (Mo.App. W.D.2004). "Similarly, although a declaratory judgment action is *sui generis*, its 'historical affinity is equitable and such actions are governed by equitable principles.'" *Id.* (citation omitted).

■ We begin our analysis by noting that "[o]rdinarily it is said that equity will enjoin the enforcement of an invalid ordinance to protect the individual citizen from multiple prosecutions, or to prevent irreparable injury to his property rights where he has no adequate remedy at law." *Browning v. City of Poplar Bluff*, 370 S.W.2d 179, 183 (Mo.App. S.D.1963). Respondents rely on *Schaefer v. Koster* in arguing that Subclass Two nonetheless has an adequate remedy at law in a pending municipal proceeding challenging the validity of a municipal ordinance. 342 S.W.3d 299, 300 (Mo. banc 2011). In *Schaefer*, the Missouri Supreme Court held, "[w]hen plaintiffs filed their declaratory judgment petition, each had the option of raising as a defense the alleged unconstitutionality" of the statute and bill in question. *Id.* at 300. "The constitutional issues should be litigated (if at all) by each plaintiff in each separate criminal case." *Id.; see also Gash v. Lafayette Cnty.*, 245 S.W.3d 229, 233 (Mo. banc 2008) (holding that where a legal remedy exists, the circuit court lacks jurisdiction to issue a declaratory judgment).

■ Bearing that precedent in mind, we see several related flaws in Respondents' argument. First, as noted above,

12. The arguments in this section apply equally to the lawfulness claims raised in Count I and discussed *infra*, as well as to the purely constitutional claims raised in Counts I, III, and IV. These arguments will not be repeated in that section.

Subclass One, which has not yet been certified, has alleged numerous procedural deficiencies as to the Notices of the Violation they received, including allegations as to procedural due process, so as to survive a motion to dismiss. The petition alleges similar procedural inadequacies as to the Notices of Violation applicable to Subclass Two. The allegations as to the notices involving Subclass Two could be characterized as slightly less deficient than those applicable to Subclass One, but the petition includes allegations that the notices are deficient such that the now-unknown members of Subclass Two are unaware of the proper procedure or even the proper forum for litigating their claims. While it may be hard to argue that the *named representative* of Subclass Two is unaware of the proper procedures to challenge these issues before the municipal court, the now-unknown members of the class, who receive these allegedly deficient notices, are in an identical position as were the members of Subclass One before they paid the fine for the violation they received. It is difficult to conclude that the members of Subclass Two are not able to challenge the ordinance in this action based solely on the fact they have not yet paid the fine, but the members of Subclass One have a valid cause of action based on a similarly deficient notice only because they have already paid the fine. At this procedural juncture, we determine that the allegations in the petition for Subclass Two regarding the deficiencies in the Notice of Violation are sufficient to overcome a motion to dismiss on this issue.

Finally, we note this case differs in significant ways from an action addressing some of the same issues recently before

the Eastern District of this court in *Smith v. City of St. Louis*, 409 S.W.3d at 407. In *Smith,* a similar subclass as Subclass Two was precluded from seeking an injunction because the Eastern District determined that the plaintiffs had an adequate remedy at law. *Id.,* at 414–15. But *Smith* is not on point for two reasons. First, in that action, the subclass in question sought only injunctive relief, not damages, in contrast to the action at bar. Second, because the action against the City of St. Louis was reviewed based on a grant of summary judgment, rather than a motion to dismiss, the Eastern District had the benefit of an uncontradicted affidavit "from the clerk of the municipal court stating that, pursuant to the designation and direction of the municipal court judges, the St. Louis traffic violation bureau accepts and receives payments of the $100 red light enforcement program fines." *Id.,* at 412. That is not the case here.

We additionally disagree with *Unverferth* and *Edwards, supra,* and with *Ballard v. City of Creve Coeur,* 419 S.W.3d 109, 123, 2013 WL 5458971, at *12 (Mo. App. E.D. Oct. 1, 2013), all of which were similarly postured to the case at bar, in which the Eastern District determined that a class in the same situation as Subclass Two had an adequate remedy at law. The Eastern District did not address the implications for ATS, a private defendant who, here, is alleged to play law enforcement, prosecutorial and/or adjudicative roles in the underlying offenses, as noted above.[13] The United States Supreme Court in *Tumey v. Ohio,* recognized that to subject a defendant to criminal sanctions involving his liberty or

---

13. Even if the trial court could have correctly determined that Subclass Two had an adequate remedy at law as to the municipality, ATS makes no meaningful argument in its *joint* brief distinguishing its status or explain-

ing how Subclass Two would have an adequate remedy at law as to the claims against ATS, when ATS is not a party to the underlying offense pending in the municipal court.

property before a tribunal that has a direct, personal, and substantial pecuniary interest in convicting him is a denial of due process of law. Notably, ATS is not a party to the underlying offenses pending in the municipal court.[14] 273 U.S. 510, 523, 47 S.Ct. 437, 71 L.Ed. 749 (1927). Further, our Supreme Court has recognized that to allow private prosecutors, employed by private citizens, to participate in the prosecution of a defendant "is inherently and fundamentally unfair." *State v. Harrington*, 534 S.W.2d 44, 48 (Mo. banc 1976). Here, Appellants alleged that ATS or its paid employees (who were not attorneys licensed in the state of Missouri) acted as law enforcement officers in making the initial determination that the ordinance had been violated; acted as prosecutors in filing the charge, in receiving rebuttal submissions from rental-car companies, and in sending out notices of the violations; and acted as the judge in considering and ruling on rebuttal submissions from rental-car companies and owners who allege they were not the driver at the time of the offense, and in accepting the plea of guilty and receiving the fines.

■■■■ The purposes behind the Declaratory Judgment Act support our holding. Under section 527.120, the stated purpose of such an action is to "afford relief from uncertainty and insecurity with respect to rights, status and other legal relations." Further, "[o]ne of the purposes of the Declaratory Judgment Act is to reduce litigation." *Planned Parenthood of Kansas v. Donnelly*, 298 S.W.3d 8, 13 (Mo.App. W.D.

2009). To allow multiple "suits with the same purpose would run contrary to the purpose of the Act." *Id.* Requiring each of the hundreds, if not thousands, of members of Subclass Two to individually comply with the allegedly faulty, illegal and confounding procedure contained in the Notice of Violation and then requiring each member to bring a separate individual action would not reduce litigation and would violate the purpose of the Declaratory Judgment Act, particularly given the parallel litigation of Subclass One.

We accordingly hold that Subclass Two has alleged that it is without an adequate remedy at law and its allegations survive Respondent City's and Respondent ATS's motion to dismiss.

### COUNTS I, III, and IV—LAWFULNESS and CONSTITUTIONAL CLAIMS

#### (Subclasses 1 and 2)

Having addressed the threshold claims, we next consider Appellants' substantive challenges to the constitutionality and lawfulness of the ordinance. We address whether those claims survive Respondents' motion to dismiss.

#### A. *City's authority to enact under its police power*

Appellants raise a number of challenges to the City's authority to enact the ordinance. They argue that the ordinance was not validly enacted pursuant to section 304.120.2(1) because it is not an "additional rule[ ] of the road." They also argue that

---

14. As explained *infra*, we do not resolve here whether the ordinance in question was criminal or quasi-criminal in nature. We note, however, that some red-light ordinances in Missouri have been deemed quasi-criminal, thereby qualifying for rational-basis review. *See, e.g., Mills*, 2010 WL 3526208, at *8, *and Nottebrok*, 356 S.W.3d at 258 (overruled on other grounds). But even notwithstanding the nature of ordinance, the rules of criminal procedure apply to prosecution of municipal ordinances, including the criminal standard of proof beyond a reasonable doubt. *City of Kansas City v. McGary*, 218 S.W.3d 449, 452 (Mo.App. W.D.2006) (citation omitted).

even if the ordinance was appropriately enacted pursuant to section 304.120, the ordinance has no "substantial and rational relationship to the health, safety, peace, comfort and general welfare" of its citizens, as set out below. Appellants further argue that the ordinance was not validly enacted because it is a money-making scheme. Because the second and third claims raise factual issues not appropriate for resolution on a motion to dismiss, we reverse.

■ Municipalities are creatures of the legislature. *Anderson v. City of Olivette*, 518 S.W.2d 34, 39 (Mo.1975). A city has no inherent powers but is confined to those expressly delegated by the state and those necessarily implied in the authority to carry out the delegated powers. *Premium Standard Farms, Inc. v. Lincoln Twp. of Putnam Cnty.*, 946 S.W.2d 234, 238 (Mo. banc 1997); *Pearson v. City of Washington*, 439 S.W.2d 756, 760 (Mo. 1969) (holding that "[m]unicipal corporations owe their origins to, and derive their powers and rights wholly from[,] the state"). A charter city, such as the City of Kansas City, does not require specific legislative authority to adopt an ordinance, but its ordinances cannot conflict with state statute. *City of Kansas City v. Carlson*, 292 S.W.3d 368, 371 (Mo.App. W.D. 2009).

■ The legislature has granted municipalities the power to regulate traffic in section 304.120.2, where it empowered municipalities to make "additional rules of the road or traffic regulations to meet their needs and traffic conditions." *Nottebrok*, 356 S.W.3d at 261. Appellants argue that the regulation is not an additional rule of the road because it "does not regulate any new, supplemental, or separate conduct" and merely "attempts to enforce existing regulations using a photo enforcement system." Appellants cite the following provi-

sion in the ordinance as indicative of an admission that it is not an additional rule of the road: "a violation of this section shall not be prosecuted if the owner or other proper defendant is also accused of committing a violation of section 70–954 of this code prohibiting running red lights." In short, Appellants argue that an enforcement system is not a rule of the road.

■ On this point, we agree with the *Unverferth* court, which concluded that Florissant's ordinance amounted to a proper exercise of control over traffic on city streets. 419 S.W.3d at 83, 2013 WL 4813851, at *1; *see also Edwards*, ―― S.W.3d at ――, 2013 WL 5913628, at *1. Although Appellants splice the statute to reach the opposite conclusion, section 304.120.2 not only permits additional rules of the road but also allows municipalities to make "traffic regulations to meet their needs and traffic conditions." An ordinance delineating an enforcement mechanism falls within the statute's purview of meeting a municipality's "needs and traffic conditions." On this issue, we see no error in the trial court.

■ Appellants next argue that even if the ordinance was appropriately enacted pursuant to section 304.120, the ordinance has no "substantial and rational relationship to the health, safety, peace, comfort and general welfare" of its citizens. "Generally, the function of the police power has been held to promote the health, welfare, and safety of the people by regulating all threats either to the comfort, safety, and welfare of the populace or harmful to the public interest." *City of Kansas City v. Jordan*, 174 S.W.3d 25, 40 (Mo.App. W.D. 2005) (citing *Craig v. City of Macon*, 543 S.W.2d 772, 774 (Mo. banc 1976)). The police power has been defined in this manner:

[The] police power in its final analysis is nothing more nor less than the power to govern and in all cases where a matter is affected with a public interest a sovereign is authorized to exercise the police power. Such power is incapable of exact definition, but the existence of it is essential to every well ordered government. This is so for the reason that the police power of a state is that power which is necessary for its preservation and without which it cannot serve the purpose for which it was formed. As has been well said, the police power of a state may be shortly defined to be the power of the legislature to make such regulations relating to personal and property rights as appertain to the public health, the public safety, and the public morals. These principles are so well known that it is unnecessary to cite the authorities.

*Jordan,* 174 S.W.3d at 40 (citation omitted).

But even though a municipality may enact an ordinance pursuant to its police power, and even though the police power is broad, the police power is not unlimited and cannot lessen constitutional protections. *Id.* "[T]he exercise of the police power cannot be made a cloak under which to overthrow or disregard constitutional rights." *Id.* (citation omitted). "The police power is limited by: (1) the rights guaranteed by the Constitution, (2) the necessity of a legitimate public purpose, and (3) a reasonable exercise of the power." *President Riverboat Casino–Mo., Inc. v. Mo. Gaming Comm'n,* 13 S.W.3d 635, 641 (Mo. banc 2000) (citation omitted). "The test used to decide the validity of a state's police power is one of *reasonableness." Jordan,* 174 S.W.3d at 41 (emphasis added). "The exercise of police power will be upheld if any state of facts either known or which could be *reasonably* as-

sumed afford support for it." *Id.* (citation omitted and emphasis added).

"Statutes enacted under the police power for the protection of the public health or safety, for the prevention of fraud and for the public welfare, must have some substantial relation to those objects." *Id.* at 41–42 (citation omitted). "From its very nature the police power is a power to be exercised within wide limits of legislative discretion and if a statute appears to be within the apparent scope of this power the courts will not inquire into its wisdom and policy, or undertake to substitute their discretion for that of the legislature." *Id.* at 42. "If *reasonable* minds might differ as whether an ordinance has a substantial relationship to the health, safety, or welfare of the public, then the issue must be decided in favor of the ordinance" *Id.* (emphasis added).

Appellants allege numerous facts that call into question whether the ordinance has a substantial relationship to the health, safety, peace, comfort, and general welfare of the public or, put another way, whether the ordinance was reasonable. Specifically, as noted above, Appellants allege the ordinance does not actually promote public safety for several reasons, which we repeat here:

—Defendant KC "converted misdemeanor moving violations into non-moving infractions to avoid reporting guilty pleas and convictions, which means that no driver will ever be assessed points and removed from the road for what KC calls public safety violations."

—" '[I]njury wrecks, rear-end wrecks and overall wrecks all increased' after Defendants installed the cameras" because cameras increase crashes and injuries; cameras do little or nothing to reduce accidents due to distracted or drunk drivers, which are at the root of many red-light violations.

—The cameras "replace live police officers—whose purpose is to enforce the laws and who can combat all crimes not just red light violations—with automatons capable of only one purpose: photograph the backside of vehicles in order to funnel revenue to KC and ATS." In that vein, the subclasses also allege that the program "requires pulling police officers off the street and placing them in front of a computer to review red light camera images," and, therefore, there are fewer officers on the street. The subclasses also allege that, unlike officers, the cameras do not stop drunk drivers who run red lights.

—Better traffic engineering is more effective and efficient than red-light cameras.

—Sometimes ATS receives "well over 50%" of each fine paid, and the Federal Highway Administration states that 'where a private contractor is responsible for the processing of citations, compensation based on the number of citations should be avoided' because that system invites corruption and undermines fair administration of justice.

In short, Appellants have alleged facts so as to survive Respondents' motion to dismiss. In reversing the trial court for this error, we recognize that our conclusion differs on this point from that of the Eastern District. We understand that an ordinance enacted pursuant to a municipality's police power is presumed valid and that the challenging party bears the burden of proving its invalidity. *Unverferth*, 419 S.W.3d at 94, 2013 WL 4813851, at *12 (citing *Bezayiff v. City of St. Louis*, 963 S.W.2d 225, 229 (Mo.App. E.D.1997)). In fact, as the Eastern District emphasized, that burden is high. "The burden is on the party contesting the ordinance to negate every conceivable basis which might support it." *Unverferth*, 419 S.W.3d at 95,

2013 WL 4813851, at *12. But Appellants' allegations are sufficient to survive Respondents' motion to dismiss. The trial court erred in dismissing Appellants' action.

Appellants additionally alleged facts that call into question whether the ordinance was enacted merely as a revenue-raising scheme and is thus an invalid ordinance. As in *Unverferth*, Appellants rely on *Automobile Club of Mo. v. City of St. Louis* in arguing that the ordinance was created for the purpose of generating income and is thus invalid. 334 S.W.2d 355 (Mo.1960). In that case, our Supreme Court determined that "Plaintiffs [ ] introduced a vast amount of evidence in support of their contention that St. Louis City has set its parking fees at such a large sum as to intentionally bring in far more revenue than is needed to administer its parking ordinance and, thereafter, deliberately increased its parking meter fees so as to bring in even greater revenue, thus disclosing that its Parking Meter Ordinance is but a tax measure in the thinly veiled disguise of a police regulatory measure." *Id.* at 363. The Supreme Court held that the question is, "on all the pertinent facts, whether the primary and fundamental purpose of the ordinance is regulation under the police power or revenue under the tax power." *Id.*

In this case, Appellants alleged that the ordinance exists for the purpose of generating revenue and not to promote public safety. Specifically, Appellants allege that elected representatives of the City have admitted that the purpose behind the camera program is to "make money" and that "most of the income from the fines are [sic] going to the vendor, [ATS]." To that end, as with allegations surrounding public safety, Appellants have advanced factual allegations that survive a motion to dismiss. Accordingly, the trial court erred in

dismissing Appellants' action. *See also Edwards,* —— S.W.3d at ——, 2013 WL 5913628, at *12.

**B. Conflict with Sections 302.225, 302.302, 302.010(12) on Assessment of Points**

■■■■■ Appellants argue that the ordinance in this case directly conflicts with state statutes regarding the assessment of points for the offense.[15] "A municipal ordinance must be in harmony with the general laws of the state and is void if in conflict." *City of Manchester,* 834 S.W.2d at 907 (citation omitted). "In determining whether an ordinance conflicts with general laws, the test is 'whether the ordinance permits that which the statute forbids and prohibits, and vice-versa.'" *Id.* "The ordinance may supplement a state law, but when the expressed or implied provisions of each are inconsistent and in irreconcilable conflict, then the statute annuls the ordinance." *Id.* (citation omitted).

■■■ Section 302.010(13) defines a "moving violation" as the "character of traffic violation where at the time of violation the motor vehicle involved is in motion" with certain exceptions not applicable here. Section 302.225.1 requires the municipal courts, as well as other courts, to report any moving violation to the state Department of Revenue within seven days of any plea or finding of guilt. Section 302.302.1(1) requires the Department of Revenue to assess two points against the driver's license of any person convicted of a moving violation. *Unverferth,* 419 S.W.3d at 96, 2013 WL 4813851, at *14. Thus, the argument concerns whether City's ordinance improperly conflicts with the statute regarding points assessed for a moving violation.

In this case, the ordinance and notices of violation state that no points will be assessed against the defendant's license.[16] However, the ordinance prohibits three types of moving violations. First, it states that "[n]o vehicle shall be *driven* into an intersection controlled by a traffic control signal at which an automated traffic control system is installed while the traffic control signal facing the vehicle displays a steady red signal, including a steady red arrow." 70–961(h)(1) (emphasis added). Second, it states that "[n]o vehicle shall be *driven* past a traffic control signal located along a street or highway but not at an intersection at which an automated traffic control system is installed while the traffic control signal facing the vehicle displays a steady red signal." 70–961(h)(2) (emphasis added). Third, it states that "[n]o vehicle shall be *driven* through, around or under any such crossing gate or barrier at a railroad crossing...." 70–961(h)(3) (emphasis added).

As was the case in *Unverferth,* the plain language of the ordinance indicates no real attempt to characterize the conduct as a non-moving violation.[17] *Compare Notte-*

---

15. See *supra* note 6.

16. The City offers no logical reason why it created this offense as a non-point offense. Appellants allege that the limited amount of the fine coupled with the non-point nature of the offense are solely designed to discourage the persons receiving these citations from challenging them in court or hiring lawyers to represent them in these actions. They argue that the time off of work and the attorney fees cannot be justified when the sole penalty is a $100 fine and no assessment of points against the driver's license. There does not appear to be any public safety reason why what is clearly a moving violation would be exempt from the point system, but that is not an issue that can be addressed on review of a motion to dismiss as it would require an evidentiary hearing before the lower court.

17. Other states have deemed such an ordinance to be in conflict with state law. *See, e.g., City of Orlando v. Udowychenko,* 98 So.3d

*brok*, 356 S.W.3d at 259 (holding that the language of the ordinance did not regulate moving violations where it prohibited a vehicle from being present in an intersection during a steady red light) (overruled in *Edwards*, — S.W.3d at —, 2013 WL 5913628, at *17).[18] Rather, the conduct regulated by this ordinance, a vehicle being "driven," under certain circumstances, is "quite simply and unambiguously, running a red light." *Unverferth*, 419 S.W.3d at 98, 2013 WL 4813851, at *16. In doing so, the City "permits what the state law prohibits—the classification of running a red light as a non-moving violation free from the assessment of points." *Id.; Edwards*, — S.W.3d at —, 2013 WL 5913628, at *17 (determining that an ordinance conflicts with statutes related to assessment of points where red-light ordinance "fail[ed] to require the municipal court to report a violation of the Ordinance as a moving violation to the director of revenue for the assessment of points").

As noted above, a municipal ordinance that conflicts with state statute is void. *Miller*, 834 S.W.2d at 907. As a matter of law, this statute unequivocally conflicts with the state statute and is therefore void. The trial court thus erred in dismissing Appellants' petition on this ground.

### C. Alleged Criminal Nature of Ordinance; Rebuttable Presumption

As set out above, Appellants contest the rebuttable presumption portion of the ordinance as an unconstitutional burden-shifting mechanism.[19]

The rebuttable presumption set out in City's ordinance states:

A rebuttable presumption exists that the owner of a motor vehicle operated or used in the violation of this section was the operator of the vehicle at the time and place the violation was captured by the automated traffic control system record if the following things are proved:

(1) That a motor vehicle was being operated or used;

(2) That the operation or use of the motor vehicle was in violation of this section; and

589 (Fla.App.2012) (review pending in Florida Supreme Court); *City of Commerce City v. State*, 40 P.3d 1273 (Colo.2002); *State v. Kuhlman*, 729 N.W.2d 577 (Minn.2007).

18. While not addressed in *Nottebrok* (apparently due to the parties' failure to raise the issue), we do not see how the ordinance in that matter did not conflict with section 304.120.6, which provides in pertinent part, "No ordinance shall prohibit the operator of a motor vehicle from being in an intersection while a red signal is being displayed if the operator of the motor vehicle entered the intersection during a yellow signal interval. The provisions of this subsection shall supercede any local laws, ordinances, orders, rules, or regulations enacted by a county, municipality, or other political subdivision that are to the contrary." However, this issue is not before us.

19. Appellants bootstrap the argument that the ordinance conflicts with section 304.281, governing traffic signal violations. Section 304.281 states in part that "[w]henever traffic is controlled by traffic control signals exhibiting different colored lights ..., said lights *shall* indicate and apply to *drivers* of vehicles and *pedestrians* ..." (emphasis added). Appellants argue that this statutory provision indicates that traffic lights apply *only* to drivers and pedestrians, not owners. Appellants' argument is a challenge to the ordinance's presumption that the driver was the owner. Because we remand on other grounds regarding the presumption, we do not address it further. We note, however, the Eastern District's recent determination that section 304.281 conflicts with an ordinance of the City of Ellisville. *Edwards*, — S.W.3d at —, 2013 WL 5913628, at *2. While we do not address the issue here, we find that reasoning compelling.

(3) That the defendant is the owner of the motor vehicle in question.

■ The rules of criminal procedure apply to prosecution of municipal ordinances, including the criminal standard of proof beyond a reasonable doubt. *McGary,* 218 S.W.3d at 452. Thus, in any prosecution of this ordinance, the City has the burden to prove beyond a reasonable doubt that the owner was driving at the time of the offense. A determination that the ordinance is criminal and not civil would require heightened procedural protections required by the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution and their accompanying provisions in the Missouri Constitution. *Nottebrok,* 356 S.W.3d at 257 (quoting *Mills,* 2010 WL 3526208, at *12).

■ A presumption is analyzed differently depending on whether the context is criminal or civil. *Ulster Cnty. Court v. Allen,* 442 U.S. 140, 142, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979). "The value of these evidentiary devices, [presumptions and inferences,] and their validity under the Due Process Clause, vary from case to case ... depending on the strength of the connection between the particular basic and elemental facts involved and on the degree to which the device curtails the factfinder's freedom to assess the evidence independently." *Id.* at 156, 99 S.Ct. 2213. In the criminal context, "the ultimate test of any device's constitutional validity in a given case remains constant: the device must not undermine the factfinder's responsibility at trial, based on evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt." *Id.* In civil cases, "it is only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate."

*Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 28, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). The analysis of the constitutional claims at issue thus depends on whether the ordinance is criminal or civil in nature.

What is denominated a civil proceeding may in fact be criminal. "Even in those cases where the legislature 'has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect,' as to 'transform what was clearly intended as a civil remedy into a criminal penalty.'" *Hudson v. U.S.,* 522 U.S. 93, 99, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (citations omitted). When a statute or ordinance is denominated a civil proceeding but alleged to be a criminal one, courts look at several factors. The Eastern District set out the following test for determining whether an automated traffic ordinance is civil in nature:

(1) the ordinance includes express language indicating a municipality's intention to consider a violation of the ordinance to be civil in nature; (2) the ordinance imposes a sanction that does not involve an affirmative disability or restraint on the individual but merely imposes a fine without assessing points against an individual's driver's license; (3) the civil, non-point penalty for violating the ordinance is assessed without regard to the individual's knowledge or state of mind at the time of the violation; (4) the presence of the deterrent purpose of the sanction may serve civil as well as punitive goals; (5) the behavior to which the sanction applies is not already a crime; (6) the ordinance is rationally connected to the broader, legitimate non-punitive purpose of promoting public safety; and (7) the sanction imposed by the ordinance does not appear excessive in relation to the ordi-

nance's purpose of promoting public safety.

*Nottebrok,* 356 S.W.3d at 257–58 (citations omitted). While we do not find this list exhaustive, it provides a valid basis to start the analysis.

 As with some questions surrounding the validity of the ordinance, resolution of whether the ordinance is criminal or quasi-criminal is not appropriate for review on a motion to dismiss.[20] Here, *inter alia,* Appellants allege that "despite Defendants' attempts to make [the ordinance] appear civil, it is criminal in nature because the Ordinance seeks to regulate and prosecute violations predicated solely on failure to obey traffic signals, violations that are criminal under Missouri law, and/or is criminal in effect because the Ordinance authorizes arrest as a mechanism for enforcing the Ordinance." Given the nature of the multi-factor test, we hold that Appellants were entitled to further factual development of this matter. *See Nottebrok,* 356 S.W.3d at 257–58, 259 (determining that an automated traffic ordinance was quasi-criminal where, among other factors, "the ordinance imposes a sanction that does not involve an affirmative disability or restraint on the individual but merely imposes a fine without assessing points against an individual's driver's license"; and where ordinance specified that "under no circumstance may a person be imprisoned for such an infraction") (overruled on related grounds). The City argues that the ordinance is civil in nature, but this argument is belied by the City's own Summons, which requests a plea of "guilty or not guilty" and includes the threat of a warrant and incarceration for the failure to dispose of the matter. In addition, the City's own exhibits filed with this court show that arrest warrants have been issued twice for Olinetchouk on her Summons. The trial court thus erred in dismissing the action on this issue and the cause is reversed on this basis.

In so holding, we reject Respondents' blanket argument that the rebuttable presumption merely shifts the burden of evidence, not the burden of proof. Respondents rely primarily on 1949 authority indicating that a municipality may use a rebuttable presumption in its ordinances governing parking tickets. In *City of St. Louis v. Cook,* as here, the defendant argued that the municipality's rebuttable presumption that the owner of an illegally parked vehicle violates due process in that a defendant is presumed innocent, that the burden of proof is guilt beyond a reasonable doubt, and that a defendant cannot be prejudiced by a failure to testify. 359 Mo. 270, 221 S.W.2d 468, 469 (1949). The *Cook* court, sitting in division, determined that the rebuttable presumption in the context of a parking ticket operated as a valid evidentiary tool that a shown fact may support an inference of the ultimate or main fact proved. The *Cook* court's holding was dependent on the rationale that the presumption must have some "relation to or natural connection with the fact to be inferred." *Id.* at 470. Reflecting the times, the court explored that relation or connection as follows:

> From a practical standpoint it would be impossible for the police department of the City of St. Louis to keep a watch

---

**20.** Some jurisdictions have construed redlight ordinances in the context of criminal doctrine. *See, e.g., Kuhlman,* 729 N.W.2d 577 (determining that ordinance was subject to rules of criminal procedures and deeming it unconstitutional because it "requires the owner to rebut the presumption that he or she was the driver, or face liability as the owner"), *but see Smith,* 409 S.W.3d at 417 (determining that St. Louis ordinance was quasi-criminal and constitutional under rational-basis review).

over all parked vehicles to ascertain who in fact operates them. In such a situation and in view of the purpose of City's traffic regulations, the City having shown the vehicle to have been parked in violation of the regulatory ordinance and having shown a defendant to be the person in whose name the vehicle is registered, it would seem an owner-registrant, a defendant, could not be said to be put to too great an inconvenience or to an unreasonable hardship in making an explanation if he desires. The connection between the registered owner of an automobile and its operation is a natural one.

*Id.* at 470–71.

 The *Cook* court applied a rational-basis analysis: "It is 'only essential that there shall be some *rational* connection between the fact proved and the ulti-mate fact presumed (or inferred), and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate.' " 221 S.W.2d at 470 (emphasis added).[21] If the ordinance is determined not to be quasi-criminal, then Supreme Court precedent dictates that the *Cook* standard would be the applicable standard in this case. If it is quasi-criminal, then the trial court must next examine whether there is a rational connection between the facts proved and the ultimate fact presumed. However, if the ordinance is determined to be criminal in nature, then the rebuttable presumption is invalid. "A mandatory presumption instructs the factfinder that it must infer the presumed fact if the State proves certain predicate facts." *In re J.N.C.B.*, 403 S.W.3d 120, 127 (Mo.App. W.D.2013) (citation omitted). But a rebuttable mandatory presumption is unconstitutional when the

**21.** There is much room for argument that this rationale is outdated because when *Cook* was decided, often "the head of the household titled the vehicle in his own name and drove the car most frequently." *Unverferth*, 419 S.W.3d at 109, 2013 WL 4813851, at *27 (Mooney, J., concurring in part and dissenting in part). Now, vehicles are frequently titled in joint names, the names of corporations, trusts, or multiple other entities. Employees more and more operate vehicles owned by others. Aside from the substantial transportation developments over the past sixty-four years since *Cook* was decided in division, it is noteworthy that *Cook* involved a parking ordinance, with the Supreme Court emphasizing the impossibility of keeping watch over all parked cars to ascertain ownership. Here, the violation is captured by a camera, undercutting the "impossibility" present at the time *Cook* was decided. To that end, the subclasses allege that the City opted to implement a cheaper enforcement mechanism, one involving only a single camera capturing the rear of the vehicle, where it could have utilized a photo-enforcement mechanism that includes a camera that can also photograph the driver from the front of the vehicle (and not just the rear license plate).

In that vein, the subclasses further argue that the ordinance allows for the prosecution of more than one vehicle owner where necessarily only one person can be driving. "Because liability is based on ownership," the subclasses allege, "the Ordinance establishes liability for any and all owners, which means two or more owners are held liable for the same violation" despite the fact that it is "obviously impossible for more than one person to be guilty of running a red light." In that regard, the subclasses allege that the ordinance is "also unlawful and unconstitutional because it enables KC to knowingly prosecute innocent people and/or prosecute people without probable cause to believe they were actually driving." At oral argument, Respondents conceded that where there are multiple owners of a vehicle, under the ordinance each could receive a citation, raising questions about all joint owners separately paying the fine and/or being subject to an arrest warrant. Similarly, if, for example, a car is owned by three individuals, each of whom receive a notice and each of whom pay, the City could not address at oral argument whether there was a mechanism to reimburse two of the three owners and how it would be determined who would be reimbursed.

presumed fact is an element of the crime charged because it violates the constitutional presumption of innocence as to every element of a crime and because it invades the factfinding function of the jury. *Sandstrom v. Montana,* 442 U.S. 510, 523, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). A rebuttable presumption is also unconstitutional in the criminal context if it has the effect of shifting the burden of persuasion, which the City agrees is true in this matter. *Id.* at 524, 99 S.Ct. 2450. In this case, the rebuttable presumption that the owner was also the driver is a necessary element to a violation of this ordinance and therefore would be unconstitutional in the context of a violation that is criminal in nature.[22]

The trial court thus erred in dismissing Appellants' petition on this issue.

### D. Due Process

As set out above in our discussion relating to threshold matters, the subclasses allege numerous due process deficiencies both with regard to the Notice of Violation and its compliance with Missouri Supreme Court rules, and the ordinance's compliance with due process as set out in Article I, Section 10 of the Missouri Constitution. To be clear, these due process deficiencies are raised not only to address threshold matters, but also they independently constitute claims in the petition.

■ As to allegations of violations of the Missouri Supreme Court rules, we note that "though constitutional charter cities may legislate for themselves as long as

they do so consistently with the state statute, 'that does not mean that suits by such cities in the courts of this state are not subject to rules of practice and procedure promulgated by the Supreme Court....'" *Bueche v. Kansas City,* 492 S.W.2d 835, 842 (Mo. banc 1973). As set out above, Appellants allege many inconsistencies with the Missouri Supreme Court rules, including that the Notices of Violation do not contain a court date but rather a due date for payment of the fine, in violation of Rule 37. They also allege that the Notices of Violation make mention of and sometimes instruct the accused to submit payment or rebuttal documents to ATS headquarters out of state, or to call "customer service" with questions,[23] also in violation of Rule 37. These are questions which remain undetermined by the trial court.

Similar factual issues remain as to Appellants' allegations of violations of Article I, Section 10 of the Missouri Constitution, which prohibits the deprivation of life, liberty or property without due process. At very least, Appellants are entitled to a resolution of whether the rebuttable presumption is violative of due process, *supra.* Allegations related to due process are likewise best suited for consideration by the trial court.

As Appellants' allegations of violations of due process are wrought with factual determinations necessitating remand, the trial court erred in granting Respondents' motion to dismiss in this regard. *See generally Unverferth,* 419 S.W.3d at 100–02, 2013 WL 4813851, at *18–21.

---

**22.** Given that the City must still prove elements of an ordinance beyond a reasonable doubt even if the ordinance is deemed quasi-criminal, we have questions about the viability of the mandatory rebuttable presumption in light of *Sandstrom,* which was decided after *Cook. See, e.g., State v. Dahl,* 336 Or. 481, 87 P.3d 650 (2004) (holding that, where ordi-

nance was civil, municipality must only prove elements by a preponderance of the evidence under Oregon law; mandatory rebuttable presumption was therefore constitutional).

**23.** This may constitute the unauthorized practice of law, depending on the questions asked and advice given. § 484.010.

For the above reasons, the trial court erred in granting Respondents' motion to dismiss as to Counts I, III, and IV.

### COUNTS II and VI: UNJUST ENRICHMENT

■ In Count II, Subclass One alleges unjust enrichment against the City. In Count IV, Subclass One alleges unjust enrichment against ATS. Subclass One seeks restitution as part of the damages for both counts. "A right to restitution is established under unjust enrichment if the following elements are satisfied: (1) that the defendant was enriched by the receipt of a benefit; (2) that the enrichment was at the expense of the plaintiff; (3) that it would be unjust to allow the defendant to retain the benefit." *Homecomings Fin. Network, Inc. v. Brown,* 343 S.W.3d 681, 685 (Mo.App. W.D.2011) (internal citation and footnote omitted). *See also Pitman v. City of Columbia,* 309 S.W.3d 395, 403 (Mo.App. W.D.2010) (recognizing unjust enrichment action against municipality).

■ Respondents argue that Subclass One did not allege the elements of unjust enrichment. As to the first element, Subclass One alleges that it conferred a benefit to the City *and* to ATS by making payments pursuant to the unlawful and void ordinance. As to the second element, Subclass One alleges that the City *and* ATS were unjustly enriched by the receipt of those payments. As to the third element, Subclass One alleges that the enrichment was at the expense of Subclass One in that the ordinance is invalid and it would be unjust to allow Respondents to retain any collection therefrom. "The essence of unjust enrichment is that the defendant has received a benefit that it would be inequitable for him to retain." *Jennings v. SSM Health Care St. Louis,* 355 S.W.3d 526, 536 (Mo.App. E.D.2011) (citation omitted). In light of the pleaded facts, and construing them liberally and in the light most favorable to the pleaders, we determine that Subclass One has stated a claim for unjust enrichment.

■ Respondents argue that the affirmative defense of the voluntary payment doctrine bars Subclass One from bringing a claim for unjust enrichment. That doctrine provides that a person who voluntarily pays money *with full knowledge of all of the facts* in the case, and in the absence of fraud and duress, cannot recover it back, even though the payment is made without sufficient consideration and under protest. *See Huch v. Charter Communications,* 290 S.W.3d 721, 726 (Mo. banc 2009) (emphasis added). The *Huch* court noted:

[The voluntary payment doctrine] is a recognized defense to an action for money had and received. Unless there is fraud or duress, the voluntary payment doctrine prohibits a person who voluntarily pays money with full knowledge of the facts from recovering the money. When evaluating the rationale behind this rule of law, courts emphasize that a person who, induced thereto solely by a mistake of law, has conferred a benefit upon another to satisfy in whole or in part an honest claim of the other to the performance given, is not entitled to restitution. The underlying reason for those requirements is that it would be inequitable to give such person the privilege of selecting his own time and convenience for litigation short of the bar of the statute of limitations, and thereby subject the payee to the uncertainties and casualties of human affairs likely to affect his means of defending the claim.

*Id.* (internal citations and quotations omitted).

■ But the voluntary payment doctrine is not always available. *Id.* at 727. It was not available as a defense to the

Missouri Merchandising Practicing Act. *Id.* It was also not available where a client paid fees for document production that constituted an unauthorized practice of law. *Id.* (citing *Eisel v. Midwest Bank-Centre*, 230 S.W.3d 335, 339 (Mo. banc 2007)). Most relevant to this case, the doctrine is not available where the money is paid under duress, under fraud, or under a mistake of fact. *Huch*, 290 S.W.3d at 726. At very least, Appellants in this case have alleged duress. To that end, we note *inter alia* this averment: "Plaintiff Damon and Subclass One further state that, pursuant to the alleged Ordinance violation, their payment of $100 was involuntary and not an admission of guilt or liability because they acted under duress as a result of Defendant KC's threats to take further legal action against the Accused, including arrest/imprisonment, and/or because it was impracticable to defend themselves."

■ Further, "[i]t is well settled that restitution will be granted to remedy a payment made because of a mistake of law if the surrounding facts raise an independent equity, as when the mistake is induced, or is accompanied by inequitable conduct of the other party." *W. Cas. & Sur. Co. v. Kohm*, 638 S.W.2d 798, 800 (Mo.App. E.D.1982). At this juncture, without benefit of discovery, additional factual issues remain as to whether the pleaders paid the fines and fees under duress, under fraud, under a mistake of fact, or under a mistake of law assuming the facts prove an independent equity so as to prohibit the doctrine's application. *Inter alia*, Subclass One alleges that they paid the fine and some members of the class the $4 unauthorized "convenience fee" under the threat of facing a warrant for their arrest when it is alleged that *the Respondents knew the collection procedure was illegal.* These along with the other allegations in

the petition are sufficient to allow Subclass One's unjust enrichment claims to survive a motion to dismiss.

We recognize that the Eastern District determined in similar actions that plaintiffs were not entitled to restitution based on the voluntary payment doctrine. In *Smith*, however, the procedural posture was summary judgment rather than a motion to dismiss. The *Smith* court, then, was working with undisputed facts, including an affidavit that a car owner "decided just to pay the violation and move on." *Smith*, 409 S.W.3d at 421.

Building on *Smith*, the Eastern District confronted this question in two additional cases that, similar to this action, were dismissed by the trial court. In *Ballard*, the Eastern District noted that no question of fact remained because in the petition, the plaintiff averred that she "paid the fine under the reasonable, but mistaken, belief that the Ordinance was valid." 419 S.W.3d at 123, 2013 WL 5458971, at *12. While Respondents state that the same applies in this case, the petition at very least includes the allegation, set out *supra*, that Subclass One acted under duress.

In *Unverferth*, the Eastern District determined that the voluntary payment doctrine barred recovery, reasoning that "it is not duress to do, or threaten to do, what one has a right to do" and that "until instructed otherwise by the courts, [the City of Florissant] was entitled to pursue legal action against [plaintiff] if she did not pay the fine or appear in municipal court to contest her violation." *Unverferth*, 419 S.W.3d at 107, 2013 WL 4813851, at *25; *see also Edwards*, —— S.W.3d at ——, 2013 WL 5913628, at *19. But, taking the allegations in this action and all reasonable inferences as true, which our standard of review commands, here we know of no authority indicating that City was entitled to pursue legal action against Subclass

One where Respondents knew the ordinance and/or collection procedure was illegal. The petition alleges that ATS had an opinion by Missouri legal counsel prior to the enactment of the ordinance that the ordinance was invalid. Moreover, it is important to note again that this action is asserted against two defendants, City and ATS, and that the two are alleged to work together to "engage in an underhanded practice of persecuting and bilking Missourians under the guise and pretext of a public safety program," engage in "an unscrupulous business venture between an out-of-state, for-profit corporation and a municipal government seeking new ways to fill city coffers" where the elected representatives of the City have admitted that the purpose behind the camera program is to "make money" but that "most of the income from the fines are going to the vendor, [ATS]."

*Edwards* is similarly distinguishable because in that case nothing "suggests that the parties would be arrested for failing to pay the fine." — S.W.3d at ——, 2013 WL 5913628, at *20. As noted above, that simply is not the case here. These factual distinctions and factual questions separate the case at bar from any confronted by the Eastern District.

■ We also remind that voluntary payment is an affirmative defense to a claim of unjust enrichment. *Huch*, 290 S.W.3d at 726. In light of that fact, and given the procedural posture of this case, we deem it error to dismiss Counts II and VI as a matter of law as the bare allegations of the petition, accepted as true for our purposes, could negate the defense.

The trial court erred in granting Respondents' motion to dismiss as to Counts II and VI.

## Conclusion

We hold that the trial court erred in dismissing the claims of both subclasses based on standing, waiver and estoppel and the argument that Subclass Two has an adequate remedy at law. As to Count I, we hold that the ordinance is invalid on the ground that it conflicts with state law and is therefore void and unenforceable. We hold the rebuttable presumption contained within the ordinance, that the owner was the operator of the vehicle at the time of the offense, to be unconstitutional, if the ordinance is determined to be criminal in nature on remand. Additional questions remain yet as to whether the ordinance suffers additional constitutional defects and whether and what relief accordingly might be appropriate. Because the trial court erred in granting Respondents' motion to dismiss, this cause is reversed and remanded for further proceedings consistent with this opinion.

All concur